(No. 20503.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* STEVE FICKE *et al.* Plaintiffs in Error.

*Opinion filed February 18, 1931—Rehearing denied April 14, 1931.*

WM. SCOTT STEWART, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JOEL C. FITCH, (EDWARD E. WILSON, JOHN HOLMAN, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Steve Ficke, Mike Caselli and Gus Fiocca, together with James Angelino and Vito Ficke, were indicted in the criminal court of Cook county in seven counts for violations of the "act to regulate the manufacture, transportation, use and sale of explosives and to punish an improper use of the same," approved June 16, 1887. A *nolle prosequi* was entered as to Vito Ficke and the case was stricken as to An-

gelino. The other three defendants were tried together. Fiocca was acquitted but Ficke and Caselli were convicted and sentenced to the penitentiary. They have sued out a writ of error.

The first and third counts of the indictment charged that the defendants on July 31, 1929, did sell and dispose to Joseph Altmeier four bombs with intent of the defendants that they be used for injury to and destruction of life and property, and the second count charged that the defendants did procure four bombs with the same intent. The fourth count was for aiding and abetting certain unknown persons to store four bombs, the fifth count for aiding, abetting and assisting unknown persons to remove four bombs, and the sixth count for aiding, abetting and assisting certain unknown persons in transporting four bombs, it being charged in each of these three counts that the defendants had reason to believe the bombs were intended to be used by certain unknown persons for injury to and destruction of life and property. The seventh count was dismissed during the trial. No question in regard to the indictment has been raised or argued.

The evidence shows the sale of bombs by Caselli to Joseph Altmeier, the principal witness for the People, and the sales are admitted by Caselli, whose defense is that he was entrapped by Altmeier into doing the acts which constituted the basis of his indictment. Caselli testified that Altmeier told him that the State's attorney's office was going to discover the bomb-men and Altmeier wanted a bomb, saying that if he could get one and take it to the State's attorney's office he could get a good position, and he told Caselli, as the latter testified, where to get the bombs, showing him the name of Rocco Maggio in an Italian newspaper. Altmeier told Caselli, as the latter testified, that if Caselli would do this for him Altmeier would get a good position in the State's attorney's office and would be able to do Caselli favors and Caselli should do this to favor him.

Altmeier had been in the meat business in South Chicago for many years, doing a large business wholesale and retail. In 1919 his place of business had been bombed. In 1928 his store and several others were burned. He had about $15,000 insurance, and the value of his fixtures, equipment and stock was from $45,000 to $85,000. His insurance was paid, but he afterward went into bankruptcy, lost his business and in May, 1929, was not in business. He testified that on May 28, 1929, Gus Fiocca, whom he had known for about ten years, called him on the telephone and at Fiocca's request Altmeier met him at Caselli's butcher shop, at 9203 Commercial avenue, at seven o'clock that evening. Caselli was there and these three went into the back room, where Fiocca stated to Altmeier that Caselli was trying to operate a meat market, but he was nothing but a dumb wop and did not know how to run a meat market and was getting in bad; that the people knew Altmeier and knew that he had a meat market out there and quite a few were asking for him, and what Caselli wanted to do and had got to do was to get somebody who was known out there and could get insurance; that Caselli's store was a regular shack, and they could buy a lot of cheap stuff, put in some meat, get some oil, set it on fire and get the fire insurance; that they would like to take out some bombing insurance and some fire insurance—$10,000 on each; that he would help, the whole stock and building would be blown up and they could make some "real dough." Altmeier said, "Gus, this can't be a real proposition that you have just made me. Why do you think I would be interested in anything like that?" Fiocca said, "You are not backing out, are you?" and Altmeier answered, "Absolutely; I am dropping out." Caselli said, "Sure, that's the only way," and told about a big fire he had had on West Chicago avenue when the whole front of the building was blown clear across the street. After this conversation Altmeier said he wanted time to think it over. The next Sunday Altmeier met these

men at Fiocca's house and they went over to the store and discussed the business. The next day Altmeier went over and got a job with Pat Roche, the chief investigator for the State's attorney's office of Cook county.

On the Wednesday or Thursday following, Altmeier went out again to Caselli's store and talked with Angelino, who asked him if he was trying to get a bomb; that Mike Caselli told him that Altmeier was trying to do so. Altmeier had told Fiocca that he knew a man who had done Altmeier an injury and Altmeier would like to get a bomb, and asked Fiocca if he knew who made them. When Angelino asked Altmeier if he had got a bomb, Altmeier asked Angelino if he could get one and how much it would cost. Angelino told him $100, and Altmeier said that was too much. Angelino did not get the bomb for Altmeier, and the next Sunday Altmeier went to Fiocca's and met Angelino, Caselli and others there and had a conversation with them there. Other conversations followed, and on the morning of July 2 Altmeier met Caselli at his store and was told by him that he had seen his friends on the West Side and would have the bomb for him and the price would be $200. They drove to the West Side over various streets and Caselli told Altmeier that Caselli would drive him down to get the bomb, but when he got it he should take a taxi and not a street car, as he might smash it; that nobody expected to find a bomb in a taxi, and Altmeier could tell them he did not know anything about it; that he had just got in. Finally they parked the car on the north side of Twelfth street, about a hundred feet east of Throop. Caselli went over to the corner and talked to a man standing there, then came back and warned Altmeier not to leave the car. He went away again and about twenty minutes later came back with a boy about fourteen years old. They handed a package wrapped in a newspaper to Altmeier, and he went across the street, got a Checker cab and was driven to his home, 755 East Seventy-sixth street, where he un-

wrapped the package and found it to contain a bomb consisting of five sticks. of dynamite tightly bound with copper wire, wrapped in a damp cloth, with a wrapped piece of black fuse fastened in the center stick of dynamite. About six o'clock the same afternoon he went to Caselli's store and Caselli showed him how to use it. From the store Altmeier went to the Pershing Hotel, where he met Patrick Roche, the chief investigator for the State's attorney's office, for whom he had been working since June 10 at a salary of $250 a month.

In the latter part of July, Altmeier had another conversation with Caselli about the purchase of bombs. He told Caselli that he wanted to blow up a certain place, of people who were his enemies. On the morning of July 30 Caselli told Altmeier that he could get some more bombs, and after some discussion of the number and the price Altmeier agreed to take four at $135 each—$300 in cash and a check for $240. The next day, July 31, about four o'clock, Altmeier and Caselli went to the place near Throop and Twelfth streets where they had parked the car on the previous occasion when the single bomb was delivered, and Altmeier waited in the car, as before, until Caselli returned with a boy of about fourteen years and the boy handed Altmeier a shopping bag which contained four bombs. Altmeier paid Caselli for the four bombs—$300 in six marked fifty-dollar bills which he received from Roche on July 31 and a check for $240. Police officers who had been stationed near the corner of Throop and Twelfth streets gave testimony corroborating Altmeier's as to the delivery of the bombs and concerning the arrest of the plaintiffs in error. From their testimony it appeared that several men, including Ficke and Caselli, were standing on the street, talking, when suddenly Ficke beckoned to his son, went up the back stairs and into the flat on the second floor, where he lived. The boy followed up the stairs but stopped on the porch. The boy had nothing in his hand when he went

up the stairs but when he came down he was carrying a shopping bag, and Ficke followed him down immediately. The boy went south, crossed to the east side of the street, turned the corner at Twelfth street and carried the bag in his hand to a Hudson coupe parked there. The officers arrested Ficke and Caselli immediately, took possession of the shopping bag, which contained four bombs, which were of the same character as the first bomb delivered to Altmeier. Caselli was searched and the six marked fifty-dollar bills which were paid for the bombs were taken from him.

Each of the defendants testified on the trial. Caselli and Fiocca denied Altmeier's testimony about the proposal to purchase an interest in Caselli's store, insure it, and bomb the store and collect the insurance. Caselli testified that he never talked with Altmeier about bombs before he worked in the State's attorney's office; that Altmeier told him the second time they went to get bombs that they would be followed and Caselli would be arrested with someone else but would be let out. He testified that he knew Altmeier was in the employ of the State's attorney's office after he got the first bomb and the reason for buying the bombs was to find out where they were stored for the State's attorney's use; that after he had agreed to purchase the bombs for Altmeier and the latter had told him where to go to get them he made arrangements by telephone to meet Rocco Maggio and get the bombs for $75 each. Ficke denied ever having seen Caselli before he met him in the county jail, denied specifically any of the acts testified to against him, and denied that he saw Caselli on July 31, 1929, or was arrested at the same time as Caselli or rode in the patrol wagon with him. The plaintiffs in error produced evidence of their previous good reputation and that Altmeier's reputation for truth and veracity was bad, and the prosecution, in rebuttal, produced some evidence that Altmeier's reputation was good.

Ficke's guilt was clearly established by the evidence produced by the prosecution if believed by the jury, and the verdict shows that it was believed and that Ficke's denials were not believed. The bombs were sold and delivered. They were not of a character apparently adapted to any other use than the unlawful destruction of property, with the attendant risk of the destruction of life. No other use to which they might be applied is suggested. Ficke's possession, sale and disposition of the bombs, through Caselli, to Altmeier can be explained in no other way than that he was a dealer in, if not a manufacturer of, bombs to be used for the criminal purposes of the destruction of life and property. Caselli's defense is not, like Ficke's, a denial of the sale and disposition but is that he was entrapped by Altmeier into procuring and selling the bombs, not with the intent charged in the indictment but with the intent of helping Altmeier, in his work for the State's attorney, to discover who were the bomb-men, for the purpose of enforcing the law and not of violating it. According to Altmeier's testimony of his relations to Caselli, with whom he had not been acquainted until May 28, 1929, and his conversations with him, the latter had had previous experience in the handling of bombs and in bombing, and it was a question for the jury as to which of the witnesses was the more worthy of belief. We cannot set aside their verdict on the ground that it is not sustained by the evidence.

In support of the defense of entrapment relied on by Caselli, the case of *Love* v. *People,* 160 Ill. 501, is cited as being in principle much like the present. There is little resemblance in the two cases. The offense in that case was burglary and larceny—a violation of the property rights of an individual—and inasmuch as the entry and carrying away of the property were with the consent of the owner no crime was committed. It was said of that case in *People* v. *Smith,* 251 Ill. 185, that it only announced the rule that an owner cannot aid, encourage or solicit the commission of

crime against his own property; and in *People* v. *Hartford Life Ins. Co.* 252 Ill. 398, the case was distinguished, and it was held not to be a violation of law to find out whether offenses are being committed although it is done by artifice or deceit, such as the use of decoy letters, writing letters under assumed names or furnishing money to secure evidence. It was said that a prosecution could not be defeated because the evidence of criminal acts was obtained for a reward, and there was no substantial difference between evidence so secured and the act of an informer. Altmeier, according to his testimony, had reason to believe from Caselli's own statements that he was accustomed to the use of bombs, had used them in the destruction of his own property to defraud an insurance company, and knew where and of whom he could procure bombs for his purposes. The suggestion of the use of bombs came from Caselli, and after he had made a suggestion of the unlawful use of bombs Altmeier told him there was a man who had done him an injury and he would like to get a bomb for him. There was no entrapment, no suggestion of a crime to a man who without the suggestion would not have committed any crime. True, without the expression of Altmeier's desire to get a bomb Caselli would not have committed the particular crime of selling a bomb to Altmeier. His conversation, however, justified Altmeier's suspicion that Caselli was engaged directly or indirectly in the manufacture, distribution or use of bombs, and no violation of law was committed by him, whether in the employ of the State's attorney's office or not, in trying to find out whether offenses of the character suspected were being committed. If he had written a decoy letter, using a fictitious name, asking for information as to where and how he could procure a bomb to injure the property of an enemy, it would have been no more an incitement to the commission of a crime than was the decoy letter written under an assumed name to the defendant in the case of *Grimm* v. *United States,*

156 U. S. 604, asking for information about prices and how many different kinds of obscene, lewd or lascivious pictures the defendant could furnish; or the letter written under an assumed name to the defendant in *Kemp* v. *United States,* 41 App. (D. C.) 539, asking for information whether he would undertake to commit an abortion, how much it would cost, how long the girl would have to stay in Washington, and whether it would be necessary for her to go to a hospital or the abortion could be accomplished by the use of medicine at home. In these cases the letters mailed in answer to the decoy letters received by the defendants were in violation of different sections of the United States Statutes at Large, one of which declared every obscene, lewd or lascivious book, pamphlet or picture and every written or printed card or letter giving information where, how, of whom or by what means any of these articles or things may be obtained or made was declared non-mailable under a penalty fixed by the section; and the other declared every letter or notice of any kind giving information where or by whom any act or operation of any kind for. the procuring of an abortion will be done to be non-mailable, and the defendants claimed in each case that they were incited, instigated or inveigled into the commission of the crime by the decoy letters written, the one by a detective in the employ of the post-office department, the other by a post-office inspector. It was argued upon these facts that the convictions could not be sustained because the letters of the defendants were deposited in the mails at the instance of the government and through the solicitation of one of its officers, but it was held that it did not appear that the purpose of the detective or post-office inspector was to induce or solicit the commission of a crime, and it did appear that, suspecting the defendants to be engaged in a business offensive to good morals, they sought information directly from them, and they responded by violating the law of the United States which prohibited the use of the mails to give

such information. Their violation of the law was by their own choice and in the exercise of their free will, and they could not claim in their defense that they would not have violated the law if the inquiry had not been made by the government official. The situation here is the same. Altmeier suspected that Fiocca and Caselli were engaged in the unlawful business of dealing in bombs. Instead of writing a decoy letter under a fictitious name he told Fiocca personally that he knew a man who had done him an injury and would like to get a bomb and asked Fiocca if he knew who made bombs. This was only a request for information and not a request to sell Altmeier a bomb. Caselli, however, procured a bomb at a cost, he says, of $90—$75 for the bomb and $15 for expenses. Afterward, when Altmeier made the proposition to Caselli to buy more bombs to blow up an enemy's place, Caselli entered into further negotiations and procured the other four bombs, for which he received from Altmeier $300 in cash and a check for $240, though according to his testimony, which differs from Altmeier's, the cash, alone, was the price of the bombs and he received for each one of the bombs which he delivered $75 only. The contradictions in the testimony were for the jurors' consideration, and the determination of the question which witnesses were to be believed was for their decision.

It is not an instigation or solicitation to crime for an individual or an officer of the law, having reason to believe that another is or others are committing or intending to commit or conspiring to commit criminal offenses, to furnish an opportunity for the commission of the criminal offenses which the persons concerned are committing or intending to commit. If the purpose is, in good faith, to secure evidence against persons guilty of crime and not to induce an innocent person to commit a crime, there is no merit in the claim that the person was entrapped into the commission of the crime and should therefore be relieved of criminal responsibility. Besides the cases which have been

cited this principle is sustained in *City of Evanston* v. *Myers,* 172 Ill. 266; *State* v. *Littvoy,* 52 Wash. 871; *People* v. *Conrad,* 102 App. Div. 566, affirmed in 182 N. Y. 529; *People* v. *Krivitzky,* 168 N. Y. 182; *State* v. *Smith,* 152 N. C. 798; *Dennis* v. *Dennis,* 68 Conn. 186. In the case last cited it is said that as to prosecutions for offenses not against individuals but against the public it is no defense to a prosecution for the illegal sale of intoxicating liquors that the sale was made to one who bought not for his own use but to aid in convicting the sellers. "It is not the motive of the buyer but the conduct of the seller which is to be considered." In *State* v. *Smith, supra,* in a similar case, the court in its opinion affirming the judgment says: "The Attorney General in concluding his brief says: 'In the case at bar it does not appear that the chief of police told Hammock to induce any sale. He simply furnished the money and told him to endeavor to buy the liquor. The officer doubtless had the best of reasons for believing there was a live tiger in the house of defendant. He put out his bait, and the tiger, for all his cunning, 'bolted it,' and now complains that the law of the jungle was violated else he would not have been entrapped.' The defendant's counsel in reply to this strenuously contended that his client was a donkey—not a tiger. As to that controversy, *non nostrum est, tantas componere lites.*"

It is contended that various prejudicial errors occurred during the trial. The first ruling complained of is that Altmeier was permitted to testify about the bombing of his building in 1919 and its burning in 1928. The last of these events was over a year before Altmeier's acquaintance and first conversation with Caselli. The evidence was not admissible but its reception was not prejudicial, for no claim was made that Caselli had any connection with them and the jury could not have been misled by it.

Complaint is also made that the court permitted evidence to be introduced that Caselli had had one fire and was will-

ing to have another. This refers to the first conversation between Altmeier and Fiocca and Caselli, in which Fiocca and Caselli related the story of Caselli's fire and loss, referred to Altmeier's fire, in which Fiocca said Altmeier made $65,000, and proposed the scheme to get insurance, blow up the building and "make some real dough." This account of Caselli's fire and loss was not offered in evidence to prove that Caselli had a fire, but as a part of the conversation which Altmeier had with him when the fraudulent and criminal scheme to bomb the property and defraud the insurance company was proposed to Altmeier. It was admissible as a part of the conversation and to show Caselli's familiarity with the handling, use and disposition of explosives in violation of law. In the brief of the plaintiffs in error it is stated that a large part of the record discusses a dispute between the State's attorney and the defendants as to whether or not Caselli had then a lease in his brother's name. The brief, however, gives no reference to any ruling of the court on the question and there is therefore nothing for our consideration. It is also suggested that it was error to admit Altmeier's testimony concerning the sale of other bombs than the four referred to in the indictment, but the brief refers to no objection made to such testimony. It is said that it was error to cross-examine Caselli as to prior arrests. He testified in answer to questions by his counsel that he had lived and worked in Chicago for twenty-four years and had never been in trouble or arrested before. The cross-examination was proper. Counsel further says in his brief that other instances of erroneous questioning by the State's attorney can be found on certain pages of the abstract which are mentioned; that the court unduly restricted the cross-examination of Altmeier and Roche on certain other specified pages, and that the court made rulings and remarks on other pages which are mentioned. We have examined the pages referred to and have not found any rulings or remarks of the court which were objected to that were erroneous or prejudicial to the plaintiffs in error.

Eleven instructions were given for the People, twenty-four for the defendants, and three asked by the defendants were refused. It is argued that six of those given for the People are erroneous. The first and second instructions are sections 1 and 2 of the act on which the indictment is based, and it is argued that they should not have been given because there was no evidence on which to base a charge that the defendants made, manufactured or brought into the State any article mentioned in the act or assisted others in doing so. *People v. Rongetti,* 331 Ill. 581, is cited in support of the objection. In that case the defendant was indicted for producing an abortion. The statute provided that whoever causes any woman to abort or miscarry, or attempts to procure an abortion or miscarriage, shall be imprisoned, etc. The indictment contained no count for an attempt to procure an abortion or miscarriage, but the court gave an instruction in the language of section 3 of the Criminal Code which is a statement of the law on the subject of abortion and attempted abortion. It was stated that the jury should be instructed only concerning the crime of which the defendant stands charged and this instruction should not have been given. In that case numerous errors more serious than the giving of this instruction occurred which required the reversal of the judgment. The two sections of the statute should not have been given as instructions in this case, but in the condition of the record the giving of them was not prejudicial to the plaintiffs in error. While there was no charge of the manufacture, compounding or importation of the explosives mentioned there was also no evidence of these acts, and no possible misunderstanding of the charge or confusion about the evidence could be caused by the superfluous instruction which was given as to things not charged. It may be that where an indictment charges an offense which is a completed act and a statute declares an attempt to commit that offense, though unsuccessful, an offense punishable by the same penalty, an

instruction in regard to the latter offense upon the trial of an indictment for the completed act might be prejudicial. But in this case. there is no such prejudice. It must be presumed that the jurors possessed the qualifications required by the statute to be possessed by them, which include sound judgment, suitable information, and an understanding of the English language. With these qualifications they could not be misled by this instruction as to what the plaintiffs in error were being tried for or what the jurors had a right to consider. If there was no evidence that the defendants made, manufactured, compounded or brought into the State any article prohibited by the statute the court should not have instructed the jury as to those offenses. Where a statute denounces two or more offenses but the indictment charges only one, the instructions should be limited to the offense charged in the indictment and not extend to all those mentioned in the statute, for otherwise there may result a confusion which would be prejudicial to the defendant, as in the *Rongetti case* cited. Here, however, giving the instruction was not prejudicial because there was no charge of making, manufacturing or bringing into the State any of the articles mentioned in the act, and there was no possibility of a misunderstanding by the jury.

The third instruction was section 2 of division 2 of the Criminal Code. The objection made to it is that it might be construed as assuming that a crime had been committed, and a large part of it is not applicable. It is the statutory definition of an accessory, followed by the rule of law in this State established by the statute in regard to his conviction with or without the principal. It was applicable in the determination of Fiocca's relation to the case and was properly given to the jury. It assumes no fact and it was not prejudicial to the plaintiffs in error.

Instruction No. 7, it is said in the argument for the plaintiffs in error, has been approved in *Mullinix* v. *People*, 76 Ill. 211, *Davison* v. *People*, 90 id. 221, and *Spies* v. *Peo-*

*ple,* 122 id. 1. It tells the jurors that they are the judges of the law as well as the facts in the case, and then proceeds to advise them as to the rules by which they should be governed in determining the law. The plaintiffs in error object to the instruction, not on the ground that the jurors have not the right to judge the law in criminal cases but that their right to do so is not to be controlled by the rules declared by the court in this instruction, and that the jurors have the right to judge the law in a criminal case even though they may think the judge is better qualified to do so than they are, for they may also think that he has not judged it right in the particular case. Assuming that the statute confers on juries the right to judge the law in criminal cases, and deciding only the question submitted by the plaintiffs in error, we follow the previous decisions of the court and hold the qualifications established by those decisions of the exercise of the power to judge the law and the limitations declared by them are binding on the jury.

It is contended that instructions Nos. 9 and 10 given for the People are erroneous. They are as follows:

9. "The court instructs the jury that there is no lawful inducement or solicitation to crime where the government officers merely furnish a criminal who is ready to commit an offense, with an opportunity to do so. If an officer of the law has reason to believe that the law is being violated, he may proceed to ascertain whether those who are thought to be doing so are actually committing it. If the officers of the government act in good faith and in the honest belief that the defendant is engaged in an unlawful business, of which the offense charged in the indictment is a part, and the purpose of the entrapment is not to induce an innocent man to commit a crime, but to secure evidence upon which a guilty man can be brought to justice, the defense of entrapment is without merit.

10. "The jury are instructed that if the defendant Mike Caselli, prior to the time alleged in the indictment was

solicited to procure for and sell to the witness, Altmeier, the explosive compounds as charged in the indictment, but that at the time of such solicitation he, the said Mike Caselli, was engaged in the business of procuring, or selling explosive compounds in the manner and form as charged in the indictment and for the purpose charged in the indictment, then, and in that event, the solicitations and representations made by the witness, Altmeier, to the defendant, Mike Caselli, to induce him, the said Mike Caselli, to procure for or sell to the witness, Altmeier, the explosive compounds as charged in the information, would constitute no defense for the said Mike Caselli to the charge in the indictment. In other words, if the jury believe from the evidence, beyond a reasonable doubt, that the defendant, Mike Caselli, at the time of such solicitations, was engaged in the business of procuring or selling explosive compounds, it is no defense for him that he was induced by solicitations and misrepresentations to procure or sell such explosive compounds in the manner and form and for the purpose charged in the indictment."

These two paragraphs constitute one instruction intended practically to cover the special features of this particular case. The first paragraph, numbered 9, is abstract. It states general rules of law without direct reference to the special facts of the particular case. The second paragraph (No. 10) applies the principles announced in the first to the particular facts. The plaintiffs in error contend that No. 9, in stating that "where the government officers merely furnish a criminal who is ready to commit an offense with an opportunity to do so," assumes that Caselli was a criminal ready to commit the offense. No. 9 assumes nothing. It lays down rules where certain circumstances exist and states the rules which govern the action of officers of the law if certain circumstances exist, but it does not assume their existence in this case. No. 10 applies these rules to the facts in the case on the theory of the prosecution, ex-

pressly leaving the determination of the facts to the determination of the jury from the evidence beyond a reasonable doubt. It was the theory of the prosecution that there was evidence from which the jury might believe that Caselli was engaged in dealing in bombs for illegal use; that he tried to induce Altmeier to join him in an enterprise requiring the illegal use of a bomb; that Altmeier concluded that Caselli knew of and could reach a source of supply, and acting upon that conclusion found it correct. The instruction did not assume the truth of this hypothesis but submitted the correctness of the hypothesis to the determination of the jury, stating what results would follow if it were true. The plaintiffs in error contend that there could be no unlawful sale because the purchaser did not, in fact, intend to make an unlawful use of the bombs, and cite *People* v. *Huff,* 339 Ill. 328, and *People* v. *Peters,* 265 id. 122, neither of which is in point. The *Huff case* merely held that it was impossible to commit the crime attempted—did not excuse an attempt. In the *Peters case* it was held that not bribery but an attempt to bribe was shown, where the attempt failed because the acceptance by the person intended to be bribed was merely with the intention of bringing the other person to justice. If the plaintiffs in error had reasonable grounds to believe that the use Altmeier intended to make of the bombs was unlawful the offense was complete. That they had such belief is evidenced by the price charged, the clandestine negotiations and methods of delivery, and the very form of the bombs, apparently hand-made and unusual for any lawful business of which we know. Altmeier's actual intent had nothing to do with the transaction if the plaintiffs in error sold the bombs with the expectation that they would be used unlawfully.

In this connection, also, it is urged that the court erred in refusing to give instructions Nos. 38, 39 and 40 offered upon the subject of entrapment. There was no error in the refusal, however, for the instructions required an ac-

quittal of Caselli if he was induced by Altmeier to make the sale of these bombs, regardless of the fact whether he had been before engaged in the unlawful business.

Instruction No. 11 is claimed to be erroneous. It is as follows:

"The jury are further instructed that any inducements or solicitations which might have been made to the defendant Mike Caselli, if any were made, could not be a defense for any of the other defendants to whom no such inducements or solicitations were made."

The objection made to this instruction is, that if Caselli is not guilty because he was entrapped into committing the crime Ficke might or might not be guilty, according to the evidence. There is no evidence even tending to show that Ficke was entrapped. Plaintiffs in error say that the most that can be said of the case against Ficke is that he assisted in the sale of the bombs to Altmeier and was present when they were delivered. The evidence shows that Ficke probably manufactured the bombs, but certainly they were stored in the flat which was his residence, that he went up the back stairs to the flat, beckoning to his son, who followed him and waited on the porch outside while his father went inside. The son had nothing in his hands when he went up stairs but when he came down he had a shopping bag with the four bombs in it, and he went over to Caselli's Hudson car and delivered the bag, with the bombs in it, to Altmeier, who was waiting in the car. The boy was identified by Roche as Vito Ficke. Ficke's guilt does not depend on Caselli's guilt. He delivered the bombs for the purpose for which they were manufactured without any entrapment. His keeping and storing of the bombs and sale and delivery of them were his voluntary acts and without any inducement from Altmeier.

In *People* v. *Moore*, 142 App. Div. 402, the Appellate Division of the Supreme Court of New York, in affirming a judgment of the court of general sessions of the peace

in the county of New York, rendered upon a verdict convicting the defendant of knowingly receiving money for procuring and placing women in the custody of another person for immoral purposes, in violation of the statute concerning compulsory prostitution of women, held that it was no defense that a trap was set for the defendant and that the principal witness in whose custody the women were placed did not intend to make use of them for immoral purposes and did not do so, the defendant having knowingly received the money, knowingly procured the women and having delivered them with the intention that they should be used for immoral purposes. The judgment of the Appellate Division was affirmed by the Supreme Court in 201 N. Y. 507. So in *People* v. *Conrad,* 102 App. Div. 566, a woman acting under the direction of the officers of a county medical society asked the defendant, a physician, to commit an abortion on her. The defendant agreed to do so and arrangements were made for the operation, when, in response to a signal given by the woman, detectives entered and arrested the physician. It was held that the fact that the defendant was lured into the commission of the acts was no defense. "He did the act with which he was charged voluntarily, with full knowledge of the subject and of the consequences which would flow therefrom. Under such circumstances, setting a trap by which he was caught is not a defense." This judgment was also affirmed by the Court of Appeals in a memorandum decision, 182 N. Y. 929.

Upon the rendition of the verdict the defendants moved for a new trial and the motion was continued to July 10, 1930. In the meantime Judge William N. Gemmill, who had presided at the trial, had died and the motion was heard and overruled by Judge John P. McGoorty, another judge of the criminal court, as was a motion in arrest of judgment, and judgment was rendered on the verdict. The bill of exceptions was signed on August 14, 1930, as of July 28, 1930, by Judge D. J. Normoyle, chief justice of the crimi-

nal court, who certified that Judge Gemmill was dead and Judge McGoorty was not holding court and was out of the jurisdiction. It is insisted that in the absence of a statute no judge other than the trial judge was authorized to over-rule the motion for a new trial and sentence the defendants, and that section 81 of the Practice act does not confer the authority in criminal cases. It is true that the Practice act does not apply to the method of procedure in criminal cases or in chancery except as the language expressly or by clear implication refers to such procedure. (*People* v. *Murphy,* 296 Ill. 532.) Section 81 in its opening sentence does ex-pressly refer to any trial .in any civil or criminal cause, though later in the section, in providing that in case of the death, sickness or other disability of the trial judge any other judge of the same court may pass upon a motion for a new trial and allow and sign a bill of exceptions, it uses the words in a case at law. In 1895 it was held in *People* v. *McConnell,* 155 Ill. 192, that, without any statute, upon the death of a trial judge after verdict and pending a mo-tion for a new trial it became the duty of another judge presiding in the same court to decide the motion for a new trial although he had not heard the witnesses testify or seen them on the witness stand. That was a civil case, but the rule and the practice in criminal cases in regard to the duty of passing on motions for a new trial were not different from the rule and practice in civil cases. In view of the condition of the law prior to the passage of the Practice act of 1907 we are of the opinion that all the provisions of section 81 of that act apply equally to criminal and to civil cases.

The judgment is affirmed.

*Judgment affirmed.*