THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK HAMPTON, Defendant-Appellant.

First District (4th Division)   No. 1—88—3693

Opinion filed December 19, 1991.

Charles K. Piet, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Charles E. Bell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Frank Hampton, was convicted of murder and armed robbery, and sentenced to 50 years in prison. On appeal, he challenges the sufficiency of the evidence and the fairness of his trial.

We affirm.

Hampton and a codefendant, James Myers, were charged in the slaying of Gertrude Riddle, whose daughter-in-law found her body on October 28, 1986. Riddle was the victim of multiple stab wounds, punctures, and abrasions. Both defendants had worked at the same company as Riddle, but she had known Hampton better than Myers. She had dated Hampton and lent him money.

Police who arrived at the victim's home observed blood on the floor and wall where the body was found and a metal towel bar and purse on the kitchen table. There was a knife on the kitchen floor with its blade bent at a 90-degree angle. An officer found a fingerprint on the towel bar and two Kool cigarette butts under the kitchen sink. A bloody fingerprint was found inside a kitchen drawer. The police detected no evidence of forced entry and no signs that the home

had been ransacked. It was determined that the victim had died two days before, on Sunday, October 26.

The foreman of Hampton's and Riddle's place of employment testified that both had worked on Friday, October 24, 1986, and had received paychecks that day. The next Monday, neither came to work or called in. Early on Tuesday morning, Hampton came in to see his supervisor to say he was sick. Two days later, he called in to say he was in Kentucky having car problems and that his doctor had told him to take a few days off. Hampton asked his supervisor to hold his paycheck and keep his job open until Monday, when he said he would return.

Hampton had lived with Juril Bryson periodically since 1982. She had asked him to move out because of his heavy drinking, so he moved into a motel in Des Plaines. The day before Riddle's murder, on a Saturday, Bryson had eaten dinner with Hampton. She testified he had $60 on him then. Bryson said that it was Hampton's practice when they lived together to cash his paychecks, give her money for his share of the bills, and then carry the remaining cash or give it to her. He had no checking or savings accounts and no source of income except for his job.

Bryson testified that she received a telephone call at work at 8 a.m. on October 31. During this call, Hampton told her that James Myers had killed Riddle on Sunday night while he, Hampton, was shooting pool, and that Myers had threatened to kill him if he told anyone. Hampton also told Bryson that Myers planned to blame Hampton if caught because Hampton had a criminal record and would not be believed. He said that he was calling from Kentucky, that Myers was with him, and that he was afraid. Bryson told Hampton that she had already been interviewed by the police. Later that day, Hampton again called her and at one point said to call the police. He also told Bryson he had called Riddle to borrow money because Myers needed $200. When the two men came over, she said she did not have the money.

The police who arrested Hampton and Myers inspected the motel rooms in which the men had stayed. In Myers' room an officer found a washcloth in the sink with reddish-brown stains, several Kool cigarette butts, and some clothing. In Hampton's room was a package of Kools and clothing with apparent bloodstains.

In Hampton's automobile, police found a pair of jeans and a bed sheet with apparent bloodstains.

Hampton and Myers were taken into custody. Officers returned to the motel to search for a pocket knife. In the bushes was a knife with

a four-inch blade, which belonged to Myers. Pants with blood were also recovered from Myers at the time of his arrest. Myers had approximately $500 in his possession.

The owner of a video rental store testified that Hampton and Myers came in October 28 and rented a video player and tapes.

Before James Myers was offered as a witness for the State, the court granted the defense motion for a hearing to determine whether Myers was competent to testify. Dr. Albert Stipes, an expert in forensic psychiatry, was the only witness. He had interviewed the defendant for three hours and obtained a social history and psychological evaluation from Myers' brother and a psychiatric institute. The witness also reviewed Myers' police records, military records, and hospital records.

Dr. Stipes testified that Myers had attacked a superior officer while in the military in 1972, an act that the doctor said is not necessarily indicative of mental illness.

Myers had been hospitalized in 1976 after an auto accident and could not remember the details from the accident. At the time a doctor performed an electroencephalogram (EEG) on Myers and determined that he had temporal lobe epilepsy. Such a condition might cause grand mal seizures and lead to violence. Two other EEGs, performed in 1988, revealed no abnormalities, however.

Myers also had a history of drug abuse for the past 20 years. He suffered blackouts while drinking and could not recall events that occurred while he was inebriated. He reported auditory hallucinations upon being transferred to the general population of Cook County jail, but suffered them only when put into the general population at jail, and did not appear to suffer any delusions or hallucinations during Dr. Stipes' interview with him. Myers told Dr. Stipes that he had been using PCP in the month preceding his arrest in November 1986 for Riddle's murder. He said he used alcohol almost daily. Dr. Stipes also reviewed Myers' written statement given to police after his arrest in which he said that he had blacked out and could not remember certain events.

Dr. Stipes diagnosed Myers as suffering from continuous alcohol dependency and a borderline personality disorder with antisocial features. The witness concluded, however, that in his professional opinion, Myers was competent to testify in court. He cited Myers' ability to recall events and his capability for telling the truth.

The court then ruled in favor of allowing Myers to testify.

Myers testified that he had pleaded guilty to the charges against him and agreed to testify against Hampton at trial in return for a 30-year sentence.

Myers said that Hampton came to Myers' motel room on the Sunday morning of Riddle's homicide because he wanted some beer. The two men went to three different bars. On the way to the third bar, Hampton said, "I'll kill the woman and show you how sincere I am." Myers asked to be let out of the car, but Hampton said he was only kidding.

Myers testified he had consumed 20 to 30 beers and between 5 and 10 shots of tequila by the time they went to the victim's house. They also had purchased a six-pack. Myers believed that Riddle and Hampton had "gone together" and were friends.

Myers went into the living room. He heard Hampton and the victim arguing in a different room. Hampton came out and told Myers to get a rope to tie up the victim, and Myers got a cord from a coffee pot in the kitchen. Myers said he tried to tie up the victim but could not and told Hampton they should go. He said Hampton asked for his knife and told him to open it. The victim was pleading with Myers not to let Hampton hurt her.

Hampton cut her neck and told Myers to get other ones from the kitchen because the pocket knife was too dull. Myers got two knives. Hampton asked Myers to hold the victim, which he did, and Hampton started stabbing her. Myers testified he could not watch and got scared and went to the bathroom looking for an escape route. He said he grabbed the towel bar to protect himself against Hampton if necessary. Myers put the towel bar in his pants and went into the hall, where he saw Hampton dropping Riddle to the ground and plunging the knife into her. Myers told Hampton he heard the victim breathe, and Hampton then took the longer knife and stuck it in her back, pushing down on it with his knee because of the resistance.

According to Myers, Hampton directed him to search the bedroom because "she supposed to be loaded." Myers found $1,800, which he pocketed to divide up later. Myers said Hampton told him to throw a few things around to make it look like the place was ransacked.

The two men left and disposed of the knives. Myers testified that they threw Hampton's clothes in the Des Plaines River because of the bloodstains. The men split the money they had stolen and then went out drinking again.

The next morning, according to Myers, Hampton came to his motel room and said they had to go back and get a knife out of the

house. They went back and looked for 10 minutes but did not find the knife. Again, they went drinking at various taverns.

On Tuesday morning Hampton told Myers they had to leave the State. Hampton said he wanted to visit a relative. They rented a video recorder to sell in case they needed some quick cash.

Myers testified that Hampton drove to West Virginia. Myers asked him what he thought would happen if Myers turned himself in and Hampton said Myers would get the same punishment as if he had stabbed Riddle himself.

Myers denied threatening Hampton or displaying any weapons to him. He admitted to being an alcoholic and said that they stopped in bars on their way to West Virginia.

The men arrived at Hampton's brother's house in West Virginia at the end of October but stayed only a short while before deciding to go back to Illinois.

When they had gotten as far as Kankakee, Myers registered in a motel room under the name of Paul Kendall. They found a bowling alley with a bar. Myers left for awhile, and when he returned, Hampton was gone. He was not at the motel either, and Myers went back to the bar, where he was arrested.

Myers' fingerprints were found on the towel bar and there were bloodstains found on his jeans. He had $400 or $500, belonging to the victim, at the time of his arrest. He admitted his blackouts and said he may have even blacked out while in Riddle's home.

Myers did not call the police after the murder, he said, because he was drunk all of the time and did not believe that the incident had actually occurred.

The State also called a bartender at the Kankakee bowling lanes who had seen and talked to both Hampton and Myers in the bar on November 1, 1986. Hampton told the bartender he was trying to reach a brother who lived close by because they were running short of money.

Hampton's brother picked him up at the bowling alley after Hampton telephoned him and said that Myers had killed the victim and was going to kill him, too. The brother took Hampton to the police station.

The State rested following the presentation of certain stipulations.

The defense called as a witness a woman who lived four doors away from the victim. The witness recalled seeing a van driving through the neighborhood very slowly, before Riddle's death. She identified Myers as the driver and sole occupant of the van.

Hampton's brother from West Virginia testified that when he saw Hampton and Myers, Hampton appeared nervous and said he was going to Texas to look for work. According to the brother's testimony, Hampton gave him a photograph of his son. That gesture, he explained, was one Hampton had used in the past as a signal he was in trouble. Hampton hugged his brother and sister-in-law and asked them to pray for him.

Hampton's other brother, from Bradley, Illinois, testified regarding the conversation he had when Hampton called from the bowling alley and asked to be picked up.

The defense called police officers to relate statements Myers made to them upon his arrest which differed from Myers' trial testimony.

The court found Hampton guilty on all counts. A different judge denied the post-trial motion and sentenced him to 50 years in prison.

OPINION

Hampton challenges his conviction as being fatally deficient because it is based in large part upon the testimony of his codefendant, an alcoholic drug user who was given leniency in exchange for his testimony. He cites cases for the proposition that uncorroborated testimony of an accomplice must be cautiously scrutinized on appeal because it is suspect. See, *e.g., People v. Ash* (1984), 102 Ill. 2d 485, 468 N.E.2d 1153.

The State relies on the standard of review that requires this court to view the evidence in the light most favorable to the State and reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*E.g., People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) In *Young*, the court held that testimony of an accomplice is sufficient to sustain a conviction, even if uncorroborated, if it convinces the trier of fact of the defendant's guilt beyond a reasonable doubt.

██ In the pending case, the trial court evaluated the credibility of the witnesses, including Myers, and concluded that Hampton had been proved guilty of murdering Riddle beyond a reasonable doubt. There were no facts presented that would have mitigated the offense to a lesser grade, and Hampton presented no evidence to indicate he did not participate in the slaying of the victim. Even if Myers had done the actual stabbing and Hampton had held the victim and aided and abetted her slaying, both defendants are equally guilty under the evidence adduced at trial. That Myers plea-bargained and received a 30-year sentence in exchange for testifying against Hampton does not

destroy his credibility as to the main events that occurred in the victim's home on October 26 and afterwards. The two men were jointly responsible for Riddle's brutal death and robbery; their subsequent flight from the State also suggests their guilt.

If Hampton truly had wanted to contact the police and escape from his supposedly threatening partner, the record indicates he had several opportunities to do so. Instead, the two men drank their way to and from West Virginia before Hampton finally told his brother to come and pick him up.

The record also contains evidence that corroborates Myers' ability to recall the events surrounding the killing. For example, he testified that more than one knife was used on the victim. This is supported by the doctor who performed the autopsy, who said that more than one weapon had made the wounds. Other, pretrial statements of Myers were also substantiated, such as the location of the pocket knife and the fact the coffee pot cord had been cut. Myers' version of the events following the murder was partially corroborated by independent witnesses, such as the video store owner and Hampton's brother from West Virginia.

Hampton's attempt to establish that Myers had exerted a coercive restraint upon his ability to contact police fails in light of the lapse of time from the murder to the time of the arrests. Hampton did not tell his supervisor he was in trouble when he stopped in before leaving the State, nor did he take the opportunity while on the road to leave Myers behind and take off in the car he was driving.

We have reviewed the record and find no basis upon which to reverse the conviction in this case. Any discrepancies in the evidence were for the trier of fact to resolve as a matter of credibility. (*E.g., People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277, *cert. denied* (1987), 483 U.S. 1010, 97 L. Ed. 2d 745, 107 S. Ct. 3240; *People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) Hampton had the opportunity to challenge the competence of Myers as a witness, and he did so. Dr. Stipes' opinion that Myers was competent to recall events and testify at trial was not shown to be unwarranted or ill-founded. Therefore, the trial court's ruling on Myers' competency was not an abuse of discretion, nor is it against the manifest weight of the evidence.

Regarding Myers' general credibility, as distinguished from competency, his drug and alcohol use is certainly relevant (*People v. Di Maso* (1981), 100 Ill. App. 3d 338, 426 N.E.2d 972), but there is nothing in the record to suggest that the trial court failed to consider that history of substance abuse, along with all other pertinent information,

in evaluating Myers' credibility. Construing the evidence in the light most favorable to the prosecution, we conclude that Hampton's convictions must be affirmed.

The second and final issue on appeal is whether Hampton was denied a fair trial when the post-trial motions and sentencing matters were heard by a different judge. The trial judge in this case died before the post-trial and sentencing proceedings. Hampton apparently believes that because post-trial motions and sentencing matters are resolved in part by a judge's familiarity with the trial evidence, a different judge is incapable of resolving the issues presented.

■■ We disagree. In *People v. Ficke* (1931), 343 Ill. 367, 387, 175 N.E.2d 543, the Illinois Supreme Court noted that when a trial judge dies it becomes the duty of another judge presiding in the same court to decide the motion for new trial. While the new judge would not have heard the trial witnesses testify, he or she nonetheless would be qualified to review the record of the trial proceedings.

The record indicates that in the pending case the second judge reviewed the full record before ruling on the motions and imposing sentence. While Hampton asserts that "[a] primary purpose of post-trial motions is to allow the trial judge an opportunity to consider the arguments of the parties and to re-assess his rulings," we believe that another judge is capable of making that reassessment as well. To accept Hampton's argument would be to implicitly hold that the death or unavailability of a trial judge automatically triggers a new trial because the replacement judge cannot properly evaluate the first judge's rulings on the evidence. We reject such reasoning as unpersuasive and impracticable. Hampton has not demonstrated any reason why the second judge in this case should be considered incapable of reviewing the evidence and arguments in reaching her rulings. Without some showing that the second judge did not adequately review the trial evidence or understand the case, we decline to adopt Hampton's position and reverse for a new trial.

Accordingly, we affirm the conviction of Hampton and the sentence imposed thereon.

Affirmed.

McMORROW and JOHNSON, JJ., concur.