2018 IL App (1st) 180467

THIRD DIVISION
December 28, 2018

No. 1-18-0467

| | | |
|---|---|---|
| FRANK RUSSO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 03425 |
| | ) | |
| COREY STEEL COMPANY, | ) | Honorable |
| | ) | Irwin J. Solganick, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiff, Frank Russo, filed a complaint against defendant, Corey Steel Company, to recover damages for injuries he sustained when a crane struck a lift in which plaintiff was working at defendant's plant.  Defendant admitted liability and the matter proceeded to a trial before a jury solely on the issue of damages.  Following trial, the jury awarded plaintiff a total of $9.9 million in damages.  Defendant retained additional counsel and as a result the trial judge who presided over the trial recused himself from the posttrial proceedings.  Defendant filed a posttrial motion for a new trial on several grounds.  The posttrial judge granted defendant's motion for a new trial based solely on defendant's argument the trial judge erroneously allowed one of plaintiff's experts to offer an opinion on plaintiff's need for one future surgery.  The posttrial judge denied defendant's posttrial motion on the other grounds raised in the motion. Plaintiff appeals, arguing the posttrial judge should not have reversed the trial judge's ruling on the admissibility of the expert's opinion about the future surgery.

¶ 2     For the following reasons, we reverse.

¶ 3                                    BACKGROUND

¶ 4      We initially discuss only those portions of the proceedings below necessary to understand the posttrial judge's order granting defendant a new trial and the resolution of plaintiff's appeal of that order. Additional facts necessary to resolve any other issues will be discussed in conjunction with our resolution of those issues.

¶ 5      In July 2013, plaintiff was working as an electrician at defendant's steel beam manufacturing site when a trolley crane used to move steel beams struck the lift plaintiff was using to reach overhead light fixtures. Plaintiff testified he was using a man-lift. The lift has a cage, which plaintiff estimated to be 24 to 30 inches deep and approximately 48 inches wide, containing a control panel. Defendant's employee was operating the crane when a portion of the crane came into contact with a portion of the lift. Plaintiff testified that as a result of the impact he received injuries to his finger, elbow, lower back, hip and shoulder.

¶ 6      Dr. Jeffrey Coe testified as a witness for plaintiff. Dr. Coe is licensed to practice medicine in all its branches. In addition to his M.D. he has a Ph.D. in occupational medicine. Dr. Coe testified occupational medicine largely deals with assessment and rehabilitation to get people back to work. He stated he deals with specialists in various areas of medicine to try to get basic information. He works with orthopedic surgeons on an almost daily basis. Dr. Coe looks at orthopedic injuries and classifies them by type and severity regularly, "basically daily in [his] practice." Dr. Coe testified that a big part of his work, on a daily basis, is looking at injuries and telling his patient what type of pain and/or symptoms they may experience in the future. Occupational medicine involves training in many different areas of the body, "particularly areas that are prone to injury; so things like orthopedic system, neurological systems, the lungs." He also teaches occupational medicine to other doctors and health professionals. Dr. Coe later testified that he does not do surgeries himself, but he sends patients to surgeons then he gets the

patients back after surgery. Later, on re-direct examination, Dr. Coe testified he teaches medical students about injuries to the shoulders, back, and hip.

¶ 7    Dr. Coe testified that plaintiff's right hip was examined a week to ten days after the accident. At that first test, plaintiff had some minor arthritic changes to his hip. Dr. Coe testified at that time there was "nothing severe. There's no severe breakdown in the hip." The mild arthritis would not cause hip pain. Dr. Coe learned of some prior injuries plaintiff suffered. Dr. Coe testified that after plaintiff's prior injuries plaintiff "went back to full work activity as an electrician, at something that's been described as a very heavy physical demand level." Plaintiff had hip surgery in July 2014. Dr. Coe read an operative report for plaintiff's hip. As a result of the accident plaintiff sustained a labral tear. Dr. Coe opined to a reasonable degree of medical certainty that plaintiff's right hip was injured from the accident. Dr. Coe examined plaintiff in March 2016. At that time, plaintiff told Dr. Coe he was still having hip pain, which plaintiff described as a constant aching pain. Plaintiff had reduced range of motion in his hip in two of three planes of motion. Dr. Coe testified plaintiff took a "functional capacity examination" in the beginning of 2015 that concluded plaintiff could return to work at a medium physical demand level with some restrictions. Plaintiff reported pain in his hip while completing the test. Dr. Coe testified to a reasonable degree of medical certainty that the accident in July 2013 "was the cause of the condition of [plaintiff's] right shoulder, right hip, and lower back" as Dr. Coe found them when he examined plaintiff.

¶ 8    Dr. Coe was asked if he had an opinion, to a reasonable degree of medical certainty, as to whether plaintiff will need future hip surgery. Dr. Coe testified that he did, and defendant objected that an adequate foundation had not been laid. The trial judge instructed plaintiff to lay a foundation, whereupon plaintiff asked the following questions, and Dr. Coe gave the following answers:

"Q. Have you reviewed records from Dr. Shah, from Dr. Rubinstein, from physical therapy regarding the progression of this hip with post-traumatic arthritis after the crane hit the JLG? Just have you reviewed them?

A. Yes, I have.

Q. And do you, in the course of your practice with employers, employees, or patients, render opinions from time to time regularly about whether someone will need a surgery?

A. Yes.

Q. And even hip surgeries?

A. Yes."

Defendant continued to object to the foundation for Dr. Coe's answer to the question of whether plaintiff will need future hip surgery. In a sidebar outside the presence of the jury and the witness, defendant told the trial judge that in the medical records Dr. Coe reviewed, there was no mention or recommendation by any doctor that gave an opinion that plaintiff needed a surgery. Plaintiff responded that Dr. Coe gave the opinion about future surgery in his own report. Plaintiff read the relevant portion of Dr. Coe's report, which states: "In addition, at right hip surgery, Mr. Russo was found to have chondromalacia of the acetabular labrum. This finding represents a significant risk for accelerated breakdown of the right hip joint and would ultimately require right hip replacement at some point in the future." (Internal quotation marks omitted.)

¶ 9    After plaintiff discussed what Dr. Coe said in his report, the trial judge turned to defendant, who responded as follows:

"MR. OLMSTEAD [Defendant's attorney]: Again, my issue is, in terms of the records that he's reviewed, there was no opinion from an orthopedic doctor

that indicated that.  He's doing it on his own as an occupational medicine doctor, and I'd object to foundation on that."

Defendant explained that plaintiff's treating orthopedic doctor, Dr. Shah, could not relate the condition in plaintiff's hip to the accident.  The trial judge clarified with defendant that Dr. Shah did not have the opinion regarding surgery and that plaintiff was trying to elicit it from Dr. Coe, whereupon the following exchange occurred:

"THE COURT: Which just begs the question, I suppose, at some basic level, so what?  If Dr. Shah didn't have the opinion, why does that preclude Dr. Coe form giving an opinion?

MR. OLMSTEAD: No, I understand.  And I'm just making my objection for the record.  Dr. Shah is an orthopedic doctor that treated him—

THE COURT: Okay.  That may affect the weight of Dr. Coe's opinion as an occupational medicine expert.  Perhaps it does.  I don't know.  I don't know if Dr. Shah's opinion comes into this case without him being here, but perhaps it does.  I don't know.  So that's really non-responsive to Dr. Coe testifying to this, if it's been properly disclosed."

Defendant agreed the opinion was disclosed and restated that his "argument is, in terms of his [(Dr. Coe's)] background and his review of the medical records, there's nothing in the medical records to support his opinion."  The trial judge responded, "that might be subject to some cross."  Defendant stated he was just preserving his objection for the record.  The trial judge overruled the objection.

¶ 10    When proceedings before the jury resumed, Dr. Coe testified it was his opinion to a reasonable degree of medical certainty that plaintiff needs "additional treatment that would include another hip surgery, and that that accident, as I learned of it, was a factor causing the

need for additional treatment, including surgery." When asked what *type* of hip surgery, Dr. Coe responded: "That, I can't tell you. I'm not a surgical specialist. I hope I've made this clear to you here today. I'm a medical specialist. He does have ongoing pain. It is arising from his hip joint. If he were my patient, I would send him to a hip surgical specialist here in Chicago. It's for the specialist to decide on the *specific type of surgery*. There have been those discussions in Mr. Russo's case." (Emphases added.) Dr. Coe testified those discussions had ranged from arthroscopic surgery to replacing his hip.

¶ 11 On cross-examination Dr. Coe testified that all of the opinions in his report were based on reviewing plaintiff's medical records generated after the accident and examining plaintiff. Dr. Coe did not have any of plaintiff's medical records from before the accident when he prepared his report. Dr. Coe relied on plaintiff's recitation of his medical history, but he later received medical records that indicated plaintiff did not tell Dr. Coe about some prior medical complaints. Dr. Coe agreed that a record of a visit by plaintiff to Dr. Shah states that plaintiff had a right hip arthroscopy well before the injury. Dr. Coe testified Dr. Shah's records do not address the question of whether plaintiff's current ongoing right hip complaint of osteoarthritis is related to the July 2013 accident. Dr. Coe confirmed his opinion, that plaintiff may need further surgery in his hip, is because the accident aggravated the arthritis in his hip, but Dr. Coe does not know whether plaintiff's ongoing symptoms are actually because of arthritis. Dr. Coe explained: "He [(plaintiff)] needs the surgery for us to tell what's going on inside of his hip right now." He also agreed that if the ongoing symptoms were caused by arthritis, he cannot say if the arthritis was from before or after the July 2013 accident. Dr. Coe would defer to the opinion of Dr. Shah as to whether the cartilage deterioration could be related to the accident "[d]epending on what it looks like now." Defendant attempted to show Dr. Coe a portion of Dr. Shah's deposition and plaintiff objected. After a sidebar outside the presence and hearing of the jury and witness the trial judge

sustained plaintiff's objection. When cross-examination resumed, defendant asked the following question, and Dr. Coe gave the following answer:

> "Q. As to any further surgery that you opined Mr. Russo might need, you can't say to a reasonable degree of medical certainty whether it's more likely than not he will need surgery?
>
> A. Yes. That's correct."

¶ 12    On re-direct examination plaintiff asked Dr. Coe if Dr. Shah's most recent records show that Dr. Shah is recommending injections into plaintiff's hip to prepare for another hip surgery. Dr. Coe responded: "I generally, know that that was talked about. I don't know that there's a specific prescription for it."

¶ 13    Plaintiff also called Dr. Scott Rubinstein as a witness. Dr. Rubinstein is an orthopedic surgeon. Dr. Rubinstein saw plaintiff in August 2013. Plaintiff complained of right hip pain at that time. Dr. Rubinstein testified he was treating plaintiff's hip from a diagnostic point of view, but the problem in plaintiff's hip would require a hip arthroscopy, which he would refer to one of his associates to perform. Plaintiff continued to have hip pain after the surgery. In December 2013, Dr. Rubinstein ordered a "radiographic guided injection to the right hip." The injection confirmed there was "some intraarticular pathology going on in the hip that is causing him symptoms." Dr. Rubinstein testified that at the time of the incident plaintiff had a little mild arthritis, then he tore his labrum in the incident. Plaintiff then underwent surgery to remove the torn portion of the labrum. Dr. Rubinstein continued: "once you remove the labrum, which is unfortunately the only thing you can do in the type of tear [plaintiff] had *** you change the mechanics of the hip joint by altering things. *** [I]t then can lead to further wearing of the joint maybe at a more rapid pace than would otherwise happen because the alignment is a little different." Dr. Rubinstein testified he thought the injury probably led to plaintiff's mild

preexisting arthritis progressing faster than it would otherwise. Dr. Rubinstein testified that in March 2017 plaintiff received hip injections for diagnostic purposes to see if he needed another hip surgery. Dr. Rubinstein testified that in May 2017 he wrote a note in his records stating "It certainly in my opinion is related to his initial injury and needs to be taken care of." (Internal quotation marks omitted.) On the last page of the same note he wrote that plaintiff has pending requests for surgery for his hip and back from Dr. Shah and Dr. Fisher, respectively. Dr. Rubinstein stated plaintiff's "back and the hip are more likely to give him more continuing discomfort as time moves on."

¶ 14 Following trial the jury returned a verdict in favor of plaintiff and awarded $9,987,000.00 in damages. The jury itemized the damages award as follows:

- Loss of normal life experienced: $2 million
- Loss of normal life to be experienced in the future: $3 million
- Pain and suffering experienced: $1 million
- The reasonable expense of medical care, treatment, and services received: $150,000
- The reasonable expense of medical care, treatment, and services reasonably certain to be received in the future: $150,000
- The earnings and benefits lost: $387,000
- The earnings and benefits reasonably certain to be lost in the future: $1 million

¶ 15 On September 22, 2017, defendant's posttrial counsel filed their appearance. On October 4, 2017, the trial judge recused himself "for the reasons stated in open court."[1] On November

---

[1] Plaintiff filed a motion before the posttrial judge for an order transferring the case back to the trial judge for the purpose of placing on the record his reasons for recusing himself. According to a transcript of the hearing on that motion, no court reporter was present when the trial judge recused himself. In denying plaintiff's motion to transfer the case to the trial judge to make an evidentiary record, the posttrial judge stated: "From reading your motion, it appears [the trial judge] recused himself because he had a conflict of interest with [defendant's appellate attorneys] and that would impact on his ability to be fair and impartial in the case. *** [The

14, 2017, defendant's new attorneys filed a motion for a new trial or in the alternative for a remittitur of damages. Defendant's posttrial motion argued (1) the trial court improperly excluded a digital video of the accident, (2) the trial court improperly allowed opinion testimony that plaintiff will require future hip replacement surgery where no factual foundation supported that opinion, (3) no competent evidence supports the award of $150,000 for future medical costs, (4) the amounts awarded for non-economic damages "fall outside the range of fair and reasonable compensation, are the result of passion or prejudice and/or shock the judicial conscience," and (5) the total damages award "falls outside the range of fair and reasonable compensation, is the result of passion or prejudice and/or shock the judicial conscience." In support of its motion for a new trial based on the allegedly erroneous admission of Dr. Coe's testimony that plaintiff will need hip surgery in the future, defendant asserted that the defense had objected to that testimony at trial on the following grounds: (a) Dr. Coe was not competent to give that opinion, (b) there was no foundation for Dr. Coe's opinion that plaintiff will require hip surgery in the future, (c) no doctor had ever testified plaintiff needs hip surgery, (d) the doctor who treated the labral tear to plaintiff's hip did not offer any opinion as to whether any future surgery was related to the accident. Defendant argued Dr. Coe's opinion lacks foundation and is speculative. Defendant noted that during cross-examination Dr. Coe "admitted that he did not know the cause of Plaintiff's ongoing symptoms in the right hip or whether they were related to the accident." Dr. Coe also admitted plaintiff suffered from osteoarthritis before the accident and he did not know whether plaintiff's ongoing symptoms were related to the arthritis or whether they were related to the labral tear. Defendant argued Dr. Coe's opinion should have been excluded because "he could not testify to a reasonable degree of medical and surgical

trial judge's] reasons for recusing himself are clear. Everybody says they know what the reasons are, and there's no reason to send it back to him to conduct an evidentiary hearing."

certainty that there is a need for future hip surgery or that such a need resulted from the accident." Defendant also argued Dr. Coe could not give any factual foundation for his opinion, and his testimony failed to establish that hip replacement surgery is reasonably certain to follow. Defendant argued it was prejudiced because Dr. Coe's testimony undercut its theory that plaintiff's injuries from the accident cleared up within two years and no future treatment was necessary as a result of the accident. Defendant also argued "[t]his improper opinion led to and is part of the enormous damage award."

¶ 16    At a hearing on defendant's posttrial motion, defendant argued there was no factual foundation for Dr. Coe's opinion. Defendant stated: "He [(Dr. Coe)] is not the treater. Dr. Shaw was the treater. There is nothing in Dr. Shaw's records about any future surgery, much less a future hip replacement." Plaintiff argued there was testimony that the hip injury will continue to get worse over time. Plaintiff stated: "There was plenty of testimony. There was conflicting testimony on parts of that. The jurors made their determination, that's not for us to set aside after the fact." The posttrial judge asked what qualifications Dr. Coe had to render his opinion. Plaintiff responded Dr. Coe is a licensed medical doctor who teaches about workplace injuries; he routinely consults when people have injuries with regard to whether surgery is warranted; he "looked at everything and rendered the opinion, which he is allowed to do as a medical doctor." The posttrial judge asked if Dr. Coe is an orthopedic surgeon and plaintiff responded he is not. The posttrial judge stated:

> "THE COURT: So you're saying that a non-orthopedic surgeon is
> somebody who can—is competent to testify as to whether or not a patient needs
> surgery or can be dealt with in a nonsurgical or more conservative manner than
> requiring surgery?"

Plaintiff responded affirmatively and added that if there was an issue "it should have been objected to at the jury trial instead of waived and now argued for the first time at a post-trial." Defendant asserted there was a contemporaneous objection. Defendant added Dr. Coe could not say what type of surgery would be required and noted Dr. Coe's testimony that he could not say whether it is more likely than not that plaintiff will need surgery.

¶ 17    The posttrial judge first ruled that "not playing that one portion of the video I don't think is an abuse of discretion." The posttrial judge then stated, with regard to noneconomic damages, the jury is "in a better position to assess the impact of the accident or the incident on the plaintiff in the case and assess a dollar amount as to how they believed the plaintiff was impacted, both in the past and in the future." The posttrial judge then stated it had reviewed Dr. Coe's testimony and the judge had "certain concerns with regard to the qualifications and/or competency of Dr. [Coe] to render an opinion with regard to future hip surgery, and I find that based on his testimony and his qualifications, that he did not have that—the qualifications to render an opinion with regard to the need of future hip surgery." The posttrial judge concluded:

> "THE COURT: He [(Dr. Coe)] may have had concerns with regard to whether or not the plaintiff may need some treatment in the future with regard to the hip, but it was beyond the scope of his expertise to render an opinion with regard to whether or not the plaintiff would be a proper surgical candidate for hip surgery in the future, and I think that is a sufficient basis to grant a new trial as to the issue of damages."

The posttrial judge granted defendant's motion for a new trial on damages.

¶ 18    This appeal followed.

¶ 19                               ANALYSIS

¶ 20    Plaintiff argues the posttrial judge erred in reversing the prior ruling permitting Dr. Coe to opine that plaintiff would need hip surgery in the future because (i) it was within the trial judge's discretion to permit the testimony because Dr. Coe was qualified to give the opinion, (ii) the testimony at issue was cumulative of other evidence, (iii) any error was not prejudicial, and (iv) defendant failed to adequately object in the trial court therefore their argument the admission of the testimony was improper is forfeited. Defendant argues the posttrial judge properly ordered a new trial because it was error to allow Dr. Coe to give an opinion concerning the need for future surgery, the testimony was not cumulative, the testimony prejudiced defendant, and defendant made a timely objection to the testimony.

¶ 21                                I. Standard of Review

¶ 22    The parties dispute the correct standard of review this court should apply to the posttrial judge's order, and in doing so raise a question as to the role of a successor judge reviewing the ruling of the prior judge. Plaintiff argues this court would normally apply an abuse of discretion standard of review to a posttrial judge's order granting a new trial, but that standard should not apply to a successor judge reversing the discretionary ruling of a trial judge because "[n]o Illinois case gives a successor judge discretion to reverse the many discretionary evidentiary rulings by a trial judge." Plaintiff argues that because the posttrial judge did reverse the discretionary evidentiary ruling of the trial judge, the "successor judge standard of review" applies, and he cites *Balciunas v. Duff*, 94 Ill. 2d 176 (1983), in support. In *Balciunas*, our supreme court held as follows:

>        "As we have noted, in previous cases this court has indicated that prior
>    interlocutory rulings should be modified or vacated by a successor judge only
>    after careful consideration. [Citations.] In the context of discovery, where abuse
>    is said to be widespread and delay phenomenal ([citations]), we think it is

particularly appropriate for a judge before whom a motion for reconsideration is pending to exercise considerable restraint in reversing or modifying previous rulings. This is especially true if there is evidence of 'judge shopping' or it is apparent that a party is seeking, for delay or abusive purposes, a reconsideration of prior rulings." *Balciunas*, 94 Ill. 2d at 187-88.

Although *Balciunas* states how the successor judge should approach the discretionary order of a prior judge if the order comes before the successor judge, from this, plaintiff argues this court should conduct a *de novo* review of the posttrial proceedings to determine if the trial judge abused his discretion in admitting Dr. Coe's opinion because we are in the same position as the posttrial judge when he issued his order reversing the trial judge.

¶ 23 Defendant first argues plaintiff failed to raise the issue of whether the *Balciunas* standard applies to the posttrial motion in the trial court and therefore has forfeited the issue. Defendant also argues the *Balciunas* standard applies to motions to reconsider discovery orders and does not apply to posttrial motions. Defendant states that when a posttrial motion is filed, if "the trial court finds that an error has prejudiced the moving party, a new trial is required." Defendant cites *People v. Hampton*, 223 Ill. App. 3d 1088 (1991), for the proposition that another judge is capable of considering the arguments of the parties and reassessing prior rulings. *Hampton*, 223 Ill. App. 3d at 1096 (" '[a] primary purpose of post-trial motions is to allow the trial judge an opportunity to consider the arguments of the parties and to re-assess his rulings,' we believe that another judge is capable of making that reassessment as well."). Defendant argues the standard of review this court applies to a successor judge's ruling on a posttrial motion is the same standard we would apply where the same judge who presided over the trial hears a posttrial motion, and it is the posttrial judge's "exercise of discretion which is before this court on *** appeal." Defendant asserts this court does not ask whether the trial judge abused his or her

discretion "when the original order was entered in the middle of an ongoing trial." Defendant argues that in the absence of evidence of forum shopping "the successor judge steps into the position of the trial judge, and is empowered to grant the same relief for the same reasons that the original trial judge is empowered to grant." In that circumstance, defendant argues, "the traditional standard for the successor judge under *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113 (1978), applies.

¶ 24    In *Towns*, our supreme court wrote:

> "While prior rulings should be vacated or amended only after careful consideration, especially if there is evidence of 'judge shopping' on behalf of one who has obtained an adverse ruling, a court is not bound by an order of a previous judge ([citation]) and has the power to correct orders which it considers to be erroneous. Here, the cause was assigned to the second judge as a matter of procedure. The defendant could properly renew his motion, even though it had been denied by another judge, and the pretrial judge, in turn, could review and modify the first judge's interlocutory order." *Towns*, 73 Ill. 2d at 121.

Defendant asserts that "[a]pplying that traditional standard here, the applicable standard of review is whether [the posttrial judge] abused his discretion in granting [defendant's] post-trial motion for a new trial on damages." Defendant cited *Grillo v. Yeager Construction*, 387 Ill. App. 3d 577 (2008), as authority for the standard of review from an order granting or denying a posttrial motion being an abuse of discretion. That case held:

> "Generally, a trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion. [Citation.] The trial court's decision is subject to this deferential standard because the trial court had the benefit of previous observation of the appearance of the witnesses, their manner in testifying, and of the

circumstances aiding in the determination of credibility. [Citation.]" *Grillo*, 387 Ill. App. 3d at 597.

¶ 25  In reply, plaintiff argues "the Appellate Courts always concentrate on the discretion of the trial judge." Plaintiff also argues there is evidence of judge shopping in this case and implies defendant selected its posttrial counsel to create a conflict with the trial judge. Setting aside the speculative nature of this argument, assuming, *arguendo*, there is evidence of judge shopping, that fact merely requires "careful consideration" before the prior ruling is altered. *Towns*, 73 Ill. 2d at 121. There is no suggestion and no evidence the posttrial judge did not engage in very "careful consideration" before ruling on these issues and the record is directly contrary.

¶ 26  The crux of plaintiff's argument as to how the successor judge should have approached the posttrial motion is that a successor judge does not and should not have the discretion to overturn the discretionary rulings of a prior judge. We disagree. In *McClain v. Illinois Central Gulf Railroad Co.*, 121 Ill. 2d 278 (1988), our supreme court held a successor should reverse an erroneous order entered by a previous judge. The Supreme Court heard the appeal of an order denying a dismissal on grounds of *forum non conveniens*. In that case the "second judge believed that it would be inappropriate for him to overturn a prior judge's decision when that decision was vested in the trial judge's discretion." *McClain*, 121 Ill. 2d at 287. The defendant had filed four prior pleadings seeking to have the cause of action dismissed on grounds of *forum non conveniens*. *Id.* at 282-84. By the time the defendant filed the *forum non conveniens* motion giving rise to the appeal before our supreme court, the case had been reassigned to a different circuit judge ("the successor judge") for administrative reasons. *Id.* at 284. In denying the latest motion, the successor judge stated in a written order that the defendant's authority "appeared to be on point, but he refused to overturn the ruling of the previous judge because 'the ruling of a trial court on a *Forum Non Conveniens* motion is a matter of discretion, and one judge of the

circuit court having exercised that discretion, it is inappropriate for another judge of the circuit court to review that decision.' " *Id.* at 284-85.

¶ 27    In response to the successor judge's belief that "it would be inappropriate for him to overturn a prior judge's decision when that decision was vested in the trial judge's discretion" (*id.* at 287), our supreme court wrote:

> "In *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 120-21 (1978), this court held that 'a court is not bound by an order of a previous judge [citation] and has the power to correct orders which it considers to be erroneous.' A previous order committed to a judge's discretion is not likely to be erroneous, but there are circumstances when it can be overturned, such as when new matters are brought to the reviewing judge's attention and there is no evidence of judge shopping. [Citations.]" *McClain*, 121 Ill. 2d at 287.

The *McClain* court also noted that the successor judge had misapprehended a decision from our supreme court on the subject of forum *non conveniens* and as a result failed to consider a then-recently decided appellate court decision that strongly supported the motion. *Id.* at 287-88. The *McClain* court went on to discuss the considerations involved in deciding a *forum non conveniens* motion and applied them to the facts of the case. *Id.* at 288-92. The *McClain* court concluded "that the trial court abused its discretion in denying [the] motion to dismiss on grounds of *forum non conveniens*." *Id.* at 292.[2]

---

[2]    Although the *McClain* court referenced "the trial court" in finding an abuse of discretion in denying the motion, and despite the fact the *McClain* court found the granting of the motion would have been warranted at the time the action was filed, while it was still before the prior judge (see *McClain*, 121 Ill. 2d at 290), it is clear the *McClain* court held the successor judge abused its discretion in denying the defendant's motion to dismiss. The court specifically noted that the "motion giving rise to this appeal" was the motion that was before the successor judge. *McClain*, 121 Ill. 2d at 284. The court also addressed circumstances surrounding the motion that

¶ 28    Thus, in *McClain*, our supreme court found that the successor judge should have exercised his discretion to undo the erroneous discretionary ruling of the prior judge.  See also *People v. DeJesus*, 127 Ill. 2d 486, 494 (1989) ("This court has stated, in a variety of contexts, that an interlocutory order may be reviewed, modified or vacated under certain circumstances before final judgment, and it is of no consequence that the original order was entered by another circuit judge.  [Citations.]"); *People v. Brown*, 2018 IL App (4th) 160288, ¶ 38 ("A court has the inherent authority to reconsider and correct its rulings, and this power extends to interlocutory rulings as well as to final judgments.  [Citations.]  [I]t is of no consequence that the original order was entered by another circuit judge.  [Citation.]"  (Internal quotation marks omitted.)).

> "An interlocutory order may be modified or revised by a successor court at any time prior to final judgment.  [Citations.]  However, in circumstances where the interlocutory order involved the exercise of a prior judge's discretion, the successor judge may overturn the order only where new facts or circumstances warrant such action and there is no evidence of 'judge shopping.'  [Citations.]  A noteworthy exception to this rule exists where the successor judge finds that the previous interlocutory order is erroneous as a matter of law.  In such a case, the successor judge has the power to correct the previous order regardless of the existence of new matter.  [Citations.]" *Bailey v. Allstate Development Corp.*, 316 Ill. App. 3d 949, 956-57 (2000).

See also *Lake County Riverboat L.P. ex rel. FRGP, L.P. v. Illinois Gaming Board*, 313 Ill. App. 3d 943, 950 (2000) ("where the successor judge finds that the previous interlocutory order is

---

arose after the initial motion was filed, including that the plaintiff had changed his residence to the chosen forum and "the amount of time the action has been pending" in the plaintiff's chosen forum.  See *id.* at 290-92.

erroneous as a matter of law, the successor judge, absent evidence of judge shopping, has the power to correct the previous order regardless of the existence of new matter"); *Eads v. Consolidated Rail Corp.*, 365 Ill. App. 3d 19, 22-23 (2006) ("ordinarily, once a judge has made a discretionary ruling, the ruling will not be disturbed by a judge of coordinate jurisdiction unless there is a change of circumstances or additional facts which warrant such action").

¶ 29 The question thus becomes whether, in this case, the posttrial judge found that the trial judge's order admitting Dr. Coe's testimony was erroneous as a matter of law, or whether the posttrial judge believed the trial judge improperly exercised his discretion. See *Balciunas*, 94 Ill. 2d at 188 ("once the court has exercised its discretion, that ruling should not be reversed by another member of the court simply because there is disagreement on the manner in which that discretion was exercised").

¶ 30 Here, based on the record before this court, we believe that the posttrial judge found that the prior order was erroneous as a matter of law. At the hearing on the posttrial motion, the posttrial judge asked, "What qualification did Dr. [Coe] have to render an opinion with regard to future hip surgery?" After counsel recited Dr. Coe's qualifications, the posttrial judge asked, "Is he an orthopedic surgeon?" Counsel responded he did not need to be an orthopedic surgeon, to which the posttrial judge responded: "So you're saying that a non-orthopedic surgeon is somebody who can—is competent to testify as to whether or not a patient needs surgery or can be dealt with in a nonsurgical or more conservative manner than requiring surgery?" After additional argument by the parties, the court ruled on the posttrial motion. In ruling on the admissibility of Dr. Coe's opinion, the posttrial judge stated as follows:

> "I have certain concerns with regard to the qualifications and/or
>
> competency of Dr. [Coe] to render an opinion with regard to future hip surgery,
>
> and I find that based on his testimony and his qualifications, that he did not have

- 18 -

> *** the qualifications to render an opinion with regard to the need of future hip surgery.

> He [(Dr. Coe)] may have had concerns with regard to whether or not the plaintiff may need some treatment in the future with regard to the hip, but it was beyond the scope of his expertise to render an opinion with regard to whether or not the plaintiff would be a proper surgical candidate for hip surgery in the future, and I think that is a sufficient basis to grant a new trial as to the issue of damages."

¶ 31 In *Gill v. Foster*, 157 Ill. 2d 304 (1993), our supreme court "reaffirmed the three-step analysis to be performed to determine an expert physician's qualifications and competency to testify announced in *Purtill v. Hess*, 111 Ill. 2d 229 (1986)." *Id*. at 316.

> "In *Purtill*, this court found:

> > (1) the expert must be a licensed member of the school of medicine about which he proposes to testify;

> > (2) the expert must prove his familiarity with other physicians' methods, procedures, and treatment; and

> > (3) once the above foundation is laid, the trial court has the discretion to determine whether the physician is qualified and competent to state his opinion regarding the standard of care. [Citation.]" *Id*. at 316-17.

"This three-step analysis was later summarized by our supreme court as containing 'two foundational requirements of licensure and familiarity, and [a] discretionary requirement of competency.' [Citation.]" *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007) (citing *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 115 (2004)). "In this third step, in which courts act as 'the gatekeeper' allowing through only reliable and relevant evidence for

consideration by the jury, courts employ 'a totality of the circumstances' approach. [Citations.]" *Roach v. Union Pacific R.R.*, 2014 IL App (1st) 132015, ¶ 55.

¶ 32    In this case, during argument on the posttrial motion, the posttrial judge evinced concern consistent with the first *Purtill* foundational requirement when he asked plaintiff's attorney if "a non-orthopedic surgeon is somebody who can *** testify as to whether or not a patient needs surgery." The posttrial judge concluded its ruling on the posttrial motion stating he believed Dr. Coe "did not have *** the qualifications to render an opinion with regard to the need of future hip surgery," and stated "it was beyond the scope of [Dr. Coe's] expertise to render an opinion with regard to whether or not the plaintiff would be a proper surgical candidate for his surgery in the future." The posttrial judge's oral ruling excludes any explicit discussion of Dr. Coe's familiarity with the methods, procedures, and treatment of orthopedic surgeons, whether plaintiff's need for surgery was within Dr. Coe's knowledge and observation, or why, based on his education and experience, Dr. Coe was not competent to testify to the need for surgery. See *Alm*, 373 Ill. App. 3d at 5 (citing *Sullivan*, 209 Ill. 2d at 115; *Ruiz v. City of Chicago*, 366 Ill. App. 3d 947, 953 (2006)).[3] Although the judge was not required to make express findings (*City of Chicago v. Harris Trust & Savings Bank*, 56 Ill. App. 3d 651, 654 (1977)), we find the posttrial judge's stated concern about whether Dr. Coe was an orthopedic surgeon and the absence of any specific findings with regard to his training, experience, and familiarity with the issue at hand, establishes that the posttrial judge's ruling was not based on a disagreement with the trial judge's exercise of discretion but a determination as a matter of law that Dr. Coe failed

---

[3]    Nor did the posttrial judge explicitly discuss the facts pertaining to the elements that determine the admissibility of expert testimony generally, specifically Dr. Coe's "knowledge, skill, experience, training, or education" or whether it had "at least a modicum of reliability," or whether his testimony "would aid the jury in understanding the evidence. [Citations.]" (Internal quotation marks omitted.) *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 565-66 (2008).

to meet the foundational requirement for expert medical testimony. [4] The posttrial judge had the

power to make that determination (*Bailey*, 316 Ill. App. 3d at 956-57) and we must now turn our

attention to whether that determination by the posttrial judge was erroneous. "Whether the two

foundational requirements have been met is a legal question, which we review *de novo*." *Roach*,

2014 IL App (1st) 132015, ¶ 51.

¶ 33    In *Gill*, 157 Ill. 2d 304, the plaintiff called a board-certified general surgeon as an expert

witness to testify regarding the standard of care and deviations therefrom by a radiologist. *Gill*,

157 Ill. 2d at 315. The plaintiff's expert "testified that during the course of his experience as a

surgeon he: has had training and experience in interpreting X-rays; has instructed medical

students on the subject of radiology as it relates to surgery; has examined tens of thousands of X-

rays; and is familiar with the standard of care of reasonably well-qualified radiologists." *Id*. at

315-16. The defendant objected to the plaintiff's expert testifying as an expert in the area of

radiology on the ground he was not a radiologist. *Id*. at 316. The trial court sustained the

objection and the appellate court affirmed. *Id*. Our supreme court held the trial court abused its

discretion in excluding the expert testimony. *Id*. at 318. On appeal to the supreme court, the

plaintiff argued that because the proffered expert "was licensed to practice medicine in all its

branches, he was qualified to testify about the standard of care of radiologists, having testified

---

[4]    If the posttrial judge determined, in his discretion, that Dr. Coe was not qualified and
competent to offer an opinion on plaintiff's need for future surgery in his gatekeeping role, that
judgment would fall under the rule taken from *McClain*, 121 Ill. 2d at 287, that "once a judge has
made a discretionary ruling, the ruling will not be disturbed by a judge of coordinate jurisdiction
unless there is a change of circumstances or additional facts which warrant such action." *Eads v.
Consolidated Rail Corp.*, 365 Ill. App. 3d at 22-23 (2006). Defendant argued there was a change
in circumstances when the trial ended and the jury returned its "enormous award for non-
economic damages." However, the end of the trial and the entry of a verdict are not
circumstances that bear on Dr. Coe's qualifications and competency to testify. See, *e.g.*, *Marcy
v. Markiewicz*, 233 Ill. App. 3d 801, 807-08 (1992) (finding no change in circumstances when
motion was renewed before successor judge where motion did not lay out any changed
circumstances or additional facts regarding basis for prior judge's order).

that he was familiar with that standard." *Id*. at 316. The plaintiff contended that the fact the proffered expert was not a practicing radiologist and not board certified in radiology only went to the weight of his opinion and not its admissibility. *Id*. Our supreme court agreed. *Id*.

¶ 34     Our supreme court relied on its holding in *Jones v. O'Young*, 154 Ill. 2d 39 (1992), in which it "held that a plaintiff's medical expert need not also specialize in the same area of medicine as the defendant doctor in order for the expert to qualify as to the appropriate standard of care." *Gill*, 157 Ill. 2d at 316 (citing *Jones*, 154 Ill. 2d 39). The *Gill* court found that "[i]n Illinois, a physician is licensed to practice medicine in all its branches ([citation]); thus, [the] plaintiff's expert satisfied the first threshold requirement." *Id*. at 317. The court also found the second threshold requirement, familiarity with the methods and procedures, was also apparent in that case. *Id*. See also *Ayala v. Murad*, 367 Ill. App. 3d 591, 597 (2006); *Parvin v. Sill*, 138 Ill. App. 3d 325, 330 (1985) ("That Parvin's expert was a radiologist did not render his testimony regarding Parvin's need for, and the cost of, back surgery inadmissible, particularly as the witness worked as a consultant to back specialists. [Citation.]").

¶ 35     Dr. Coe testified he works with orthopedic surgeons on an almost daily basis. Dr. Coe looks at orthopedic injuries and classifies them by type and severity regularly, "basically daily in [his] practice." He also testified that his specialty, occupational medicine, involved training in many different areas of the body, "particularly areas that are prone to injury; so things like orthopedic system, neurological systems, the lungs." Dr. Coe testified he teaches medical students about injuries to the shoulders, back, and hip. As previously stated, the totality of the posttrial judge's pronouncements in ruling on the posttrial motion evince the dispositive ground on which the posttrial judge granted the motion was that Dr. Coe was not an orthopedic surgeon. We believe the posttrial judge erred in holding Dr. Coe was not qualified to offer an opinion about plaintiff's need for future hip surgery on that basis. The evidence establishes that the

injuries, treatment, and prognosis in this case are matters within Dr. Coe's knowledge and observation.  See *Jones*, 154 Ill. 2d at 43.

¶ 36    Defendant argues Dr. Coe was not competent or qualified to give his opinion to a reasonable degree of medical certainty because Dr. Coe testified that he would defer to a surgical specialist as to the type of surgery plaintiff will need in the future.  Defendant cites *Landers v. Ghosh*, 143 Ill. App. 3d 94 (1986), in support of its argument.  In *Landers* a proffered expert made a statement *de hors* the record "to the effect that he was not qualified to testify regarding" whether an injury could be repaired surgically.  *Landers*, 143 Ill. App. 3d at 100.  The plaintiff objected at trial, and to resolve the issue, the trial court conducted an *in camera* examination to ask the expert whether or not he thought he was qualified to give the opinion.  *Id.*  During the *in camera* examination, the expert testified he would defer to a surgical expert.  *Id.*  The expert was asked the specific follow-up question: "Do you, doctor, feel qualified to pass judgment on whether or not the wounds are reparable."  *Id.* at 101.  The expert responded: "No, I don't think I am qualified to say that one wound is reparable and another isn't reparable."  *Id.*  Contrary to defendant's argument in this case, the trial court in *Landers* did not bar the expert's testimony because the expert testified he would defer to a surgical expert on the issue at hand; rather, the proffered expert opinion was barred because the expert testified he was not qualified to give it. See *id.* at 100-102.  The *Landers* court confirmed the basis of the trial court's order barring the testimony.  The court found:

> "[A]t the conclusion of the examination of the witness in this matter, he stated
> that he did not think he was qualified to say that one wound was reparable and
> another not.  The trial court expressly concluded that the witness did not feel he
> was qualified to render such an opinion.  Under the circumstances we cannot say
> that the trial court abused its discretion in reaching such a conclusion and,

therefore, in barring Dr. Parks' testimony concerning his opinion as to the reparability of Charles Landers' wounds." *Id.* at 102.

¶ 37    In this case, there is no statement by Dr. Coe that he feels he is not qualified to give an opinion that plaintiff will require surgery in the future.  Therefore, *Landers* is inapposite.  As for Dr. Coe's testimony that he would defer to a surgeon to determine the type of surgery needed, defendant argues Dr. Coe's reliance on a surgeon to determine the type of surgery plaintiff will need demonstrates Dr. Coe is not competent to give an opinion surgery is needed.  We disagree.  Dr. Coe's testimony established that he based his opinions on the history he received from plaintiff, plaintiff's medical records, the results of diagnostic testing, plaintiff's operative report, and Dr. Coe's own examination of plaintiff.  Dr. Coe testified to a reasonable degree of medical certainty that plaintiff "does need additional treatment that would include another hip surgery."  Dr. Coe testified: "If he were my patient, I would send him to a hip surgical specialist here in Chicago.  It's for the specialist to decide on the specific type of surgery."  On cross-examination, Dr. Coe testified he could not say to a reasonable degree of medical certainty whether it is more likely than not plaintiff will need surgery.  Rather than disqualifying Dr. Coe, we find this testimony merely goes to the scope of his opinion and the weight the jury would afford it.  Dr. Coe limited his opinion to referring plaintiff to a surgical specialist, and it was for the jury to decide how to weigh any inconsistencies in his testimony.  *Hulman v. Evanston Hospital Corp.*, 259 Ill. App. 3d 133, 149-50 (1994) (citing *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1978) (credibility of witness whose own testimony is contradictory is for the jury to decide); *Bean v. Volkswagenwerk Aktiengesellschaft of Wolfsburg, Germany*, 109 Ill. App. 3d 333, 338 (1982) ("After he was declared competent to testify as an expert by the trial judge, the jury was then free to evaluate his conclusions relative to his various fields of expertise.  Although his

testimony was, to a degree, weakened on cross-examination *** still it was for the jury to accord it the proper weight. [Citation.]").

¶ 38    This case is also distinguishable from *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730 (1994), cited by defendant. In that case, a witness sought to testify as an expert that the cause of the decedent's organic brain syndrome was a surgery and complications after surgery including the presence of status epilepticus, but the witness admitted he did not know how those complications cause brain damage. *Glassman*, 259 Ill. App. 3d at 749. The court found that the witness "mirrored the opinion of [the] plaintiff's other experts, who found that the status epilepticus caused the brain damage, although [the witness] could not explain how the condition caused the damage." *Id.* at 750. In contrast, in this case, although Dr. Coe read the reports of the other doctors, he did not simply mirror what was in them. Dr. Coe explained in detail how plaintiff's injury was caused and exacerbated and why plaintiff might need surgery.

¶ 39    Defendant next argues that in addition to Dr. Coe's alleged lack of competence and qualifications, he also "disqualified himself when he gave the following answer to the following question:

> Q. As to any further surgery that you opined Mr. Russo might need, you can't say to a reasonable degree of medical certainty whether it's more likely than not he will need surgery?
>
> A. Yes. That's correct."

Defendant argues Dr. Coe's admission demonstrates he is not qualified to give the opinion "because he cannot give an opinion to a reasonable degree of medical certainty whether plaintiff will need future surgery." Plaintiff states this argument is waived because defendant "did not object to any of the actual answers of Dr. Coe when it became allegedly apparent (during cross-examination as Defendant claims) that any testimony was objectionable." We are presented with

the question of whether defendant's initial objections to Dr. Coe's qualifications to render an opinion on the need for future surgery are sufficient to preserve defendant's argument on appeal that the opinion itself is not admissible because Dr. Coe "disqualified himself." Defendant asserts it moved to bar the opinion testimony before trial and objected at trial on the grounds (a) nothing in the record supports an opinion plaintiff will require future hip surgery, (b) no doctor could relate plaintiff's arthritis in the hip to the accident, and (c) Dr. Coe was not qualified to render such an opinion as an occupational medicine doctor. Defendant argues it was not required to object each time Dr. Coe discussed the surgery.

¶ 40    In *Johnson v. Hoover Water Well Service, Inc.*, 108 Ill. App. 3d 994 (1982), the defendant argued the trial court erred in not striking certain testimony. *Hoover Water Well Service, Inc.*, 108 Ill. App. 3d at 1006. Specifically, a court reporter testified to statements made by an employee of the defendant and on appeal, the defendant argued the court reporter-witness took the statements in violation of several rules. *Id.* The court initially noted that "the defendant failed at the time the testimony was introduced to object to it on the grounds specified above. The only objections made at that time were that the statements were not impeaching and did not constitute admissions against Hoover's interest." *Id.* The objections the defendant made at the time the testimony was introduced were overruled. "However, after the plaintiff rested his case the defendant moved that the testimony be stricken on the ground urged here on appeal." The court held the issue was waived because the motion to strike the testimony was not timely. *Id.* at 1006-07. The court first noted that "[a]n objection to evidence must be timely made and must specify the reasons for the objection. [Citation.] Generally, an objection to the admission of evidence in order to be timely must be made at the time of its admission. [Citation.]" *Id.* at 1006. The court also held that "[t]he fact that other objections were made at the time the testimony was offered does not satisfy the requirement of a timely objection or motion. An

objection to evidence based upon a specific ground is a waiver of objection on all grounds not specified." *Id.* at 1006–07. See also *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 156 (2010) ("A party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on.").

¶ 41     Defendant's argument, that Dr. Coe's answer to the aforementioned question demonstrates he cannot give an opinion to a reasonable degree of medical certainty that plaintiff may require some type of hip surgery in the future, is forfeited. Defendant did not object and move to strike Dr. Coe's testimony when it elicited that answer. Moreover, we find that because of defendant's vigorous cross-examination of Dr. Coe, defendant was not unduly prejudiced by his testimony, "and the jury had sufficient basis for according due weight to it." See *id.* And, in light of the jury's award for future medical expenses, including future surgeries, in the context of the entire damages award, any prejudice from this testimony in particular was minimal. The trial judge did not abuse his discretion in allowing Dr. Coe to offer an opinion on plaintiff's need for future hip surgery; the posttrial judge abused his discretion in striking Dr. Coe's testimony and ordering a new trial.

¶ 42     Finally, defendant argues the question of the admissibility of Dr. Coe's testimony must be viewed in context of allegedly prejudicial conduct by plaintiff's attorney (discussed below) and "the enormous award for non-economic damages." Defendant argues "[i]n context, the error in admitting Dr. Coe's opinion added to the prejudice generated by the misconduct of plaintiff's attorney, and undoubtedly contributed to the enormous award for non-economic damages." We can only construe plaintiff's argument to be that the combined prejudice from the errors in admitting Dr. Coe's opinion and from plaintiff's conduct warrants a new trial. However, for the reasons discussed above, the trial judge did not err in admitting Dr. Coe's opinion, and for the

reasons discussed below, defendant failed to establish that plaintiff's conduct prejudiced defendant. Therefore, defendant's alternative argument also fails.

¶ 43                    III. Alternative Issues in Defendant's Post-Trial Motion

¶ 44    Since we have held defendant should not have been granted a new trial based on the trial judge's admission of Dr. Coe's testimony, we must address defendant's alternative posttrial arguments. "[A]ll rulings challenged in the post-trial motions, even if not addressed by the trial court in post-trial proceedings, are properly before this court." *Bishop v. Baz*, 215 Ill. App. 3d 976, 984 (1991). "A reviewing court will reverse a trial court's ruling on a posttrial motion for a new trial only if the trial court abused its discretion." *Stamp v. Sylvan*, 391 Ill. App. 3d 117, 123 (2009). "An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.*, 342 Ill. App. 3d 150, 157 (2003). Defendant argues the trial judge improperly excluded from evidence a surveillance video of the crane impacting the lift; defendant is entitled to a remittitur of the award for future medical costs; and defendant is entitled to a remittitur of the award for non-economic damages.

¶ 45                               A. Surveillance Video

¶ 46    Plaintiff filed a motion *in limine* to exclude from evidence a video recording of the crane impacting the lift plaintiff was working on. Plaintiff's counsel stated his belief that the parties were in agreement on the motion, but defendant's attorney stated: "we agree to have the video presented. But we're not going to make any argument that the crane didn't cause the injuries that our experts acknowledge that he had." The trial judge asked defendant's attorney if there would be any argument or attempt to establish the nature and duration of the injury, and defendant's attorney responded that there would be, but it would not be linked to the video. The following exchange occurred:

"THE COURT: You're not going to try to link the video to some argument about mechanisms or force of impact. You're just going for [*sic*] make those arguments in other ways in the case—

MR. OLMSTEAD [Defendant's attorney]: Yes. I mean nothing to comment upon. It would just be our expert testifying to the duration and extent of injuries, in their opinion what this incident caused so the jury can see it. I mean there's—the issue—it doesn't go to the force of the crane at all. That's not going to be—

* * *

MR. OLMSTEAD: But I think the jury has a right to see the video more so after the—how the plaintiff was afterwards and they can just to see how he reacts in terms of—

THE COURT: We're getting a little bit beyond the motion right now. The motion is somewhat more limited. I mean you were kind of having this little discussion, it's a little broad here, but this is—you know, certain arguments. It sounds like you're in agreement with this motion?

MR. OLMSTEAD: Correct. As to force of the crane. We're still—we are disputing the extent of it. I just want to make clear—

THE COURT: I understand. I'm not taking issue. Obviously you get to defend the nature and extent of injury in other ways. I don't know what those might be, but you have a basis to do so it appears."

¶ 47 The following day the trial judge recommenced hearing on motions *in limine*. The trial judge informed the parties of its understanding that plaintiff's counsel had represented "that there was some sort of stipulation not to present [the video,] and defense then said that they intended

to present it. Plaintiff's counsel then stated the video is clearly not a video. This is a time lapse—there are shots taken out. It's like a picture, a lapse, picture, a lapse, picture." Plaintiff's counsel asserted the video was "not going at the correct speed" and therefore it was "not an accurate speed portrayal of this incident." Plaintiff's counsel stated he had no problem with photographs from the video being used, but argued that to represent this to be the speed is extremely prejudicial and has no probative value because it has already been stipulated between the parties and all the experts agree that the injuries from this accident are all from this accident. The trial judge stated it had viewed the video and described what is depicted in the video. The trial judge then stated: "So I understand [plaintiff's counsel's] arguments about the fact this is not a, I guess, video or motion picture, if you will. I don't know what the sequence is, but it's viewed as video. You can tell, if you look closely, that there is some stillness to it because it evidently is done frame by frame; but there are quite a few frames. It does present it in somewhat of a video fashion; but it's slower, I suppose, that you can kind of discern that." Later in the hearing, defendant's attorney argued as follows:

"MR. OLMSTEAD: [W]e don't intend to argue that [plaintiff] was not injured as a result of this. That's not the intent of showing it. The intent is, again, showing the severity of the accident that can be—he's not—you know, if he was cut in half or something was severe, they would want to show it. This shows him—again, even if it's in clips, the speed isn't relevant either. It shows he was able to—afterwards he gets down. He is able to walk around afterward. *** I mean the jury hears that the crane hit him. You know, the [jury] could get a different perception in terms of what it actually looked like. The crane hits the lift and that injured him. It moves the lift significantly and that's not in dispute. You

can see it. *** The issue is extent of the injury, and our experts agree he was injured or aggravated the injury."

Plaintiff's counsel reiterated that the video was not a true and accurate depiction of the accident because it is in slower motion. The trial judge remarked "it looks somewhat like a normal video but—as well you can discern perhaps that it's a little slower than real time." Plaintiff's counsel offered to stipulate to showing the portion of the video after the impact; but plaintiff's counsel argued that showing the impact would be improper because it is not the right speed and there would be no valid point to showing it. Defendant's attorney responded: "The point is to let the jury see how the accident happened ***. We're going to hear *** a crane hit a boom. I mean it's very possible that a juror could think this thing almost like completely fell over." The trial judge commented that the video was "slower motion than normal" but that there was "a rather somewhat normal cadence to the entire video."

¶ 48    The trial judge asked defendant's attorneys why they could not achieve their purpose with still frames from the video if their purpose was to show the layout of the crane, the lift, and the point of impact. The trial judge stated its concern was that the video minimized the force of the impact because it is in a slower motion. The trial judge questioned why the jury needed to see the video if the force of the impact was not made an issue in the case and noted that the video does not depict how plaintiff was "jostled about in the cage" atop the lift. The trial judge stated its concern was that the video would engrain in the jurors' minds a lower speed impact than what actually occurred. After further discussion the trial judge granted the motion to exclude the video in part. The trial judge excluded the portion of the video depicting the impact but allowed the jury to see the video from after the point of impact forward. Defendant was allowed to show the jury still images from the video showing the impact.

¶ 49    During trial, while Dr. Coe was on the stand, the court and the parties engaged in a conversation outside the presence and hearing of the jury to discuss questions from the jury for Dr. Coe.  During that sidebar conversation, the following colloquy occurred:

"THE COURT: Here's another thing, Mr. Carter [(plaintiff's attorney)]: The next time you pound your fist—and you've done it five or seven times to characterize this collision—I'm letting that video come in.  The next time it's characterized as a smash, that video is coming in.  That was a close call for this court.  And you continue to suggest to this jury that it was a very forceful impact by pounding your fists together and by calling it a smash.

There have been a lot of efforts by the plaintiffs here in a number of other ways—and there's a couple of other subtle ways that I can find—to suggest to this jury that this was a large impact, a collision.

I don't know what it was, but I do know that that video might be helpful to the jury on the issues that are being generated by plaintiff's counsels in this case. You're slamming your fists.  You've done it—you did it three times with this witness.

* * *

You're slamming your fists together every time you say it.  And that video might be instructive to this jury.  You're opening the door to it, quite frankly. That's what you're doing.  So please don't do that anymore.  Okay?  Calling it a 'smash' characterizing it as a collision and all of that is not appropriate.  Call it the 'incident' from now on, 'the date in question,' whatever you want.

They've admitted negligence.  You're the one that's generating the relevancy in that videotape.  And I'm telling you that it's been repeated, and I

haven't said anything about it from opening statements until now; but that's about the seventh fist pump that I've seen, or at least the sixth, from you in the characterization of that collision.

Come on, counsel. Don't generate relevancy of that tape. You got a favorable ruling from this court. And I'm very close to issuing it, so just don't do it anymore."

At that point defendant's attorney argued that based on the trial judge's observations and based on the fact Dr. Coe testified he did review the video and found it helpful, the videotape was relevant to show to the jury. The trial judge disagreed with defense counsel that Dr. Coe testified he found the video helpful. The trial judge stated Dr. Coe stated it was not helpful and he did not base his opinion on it. The trial judge denied defendant's motion for the court to review its prior ruling regarding the video, and then stated as follows:

"THE COURT: I would note that in this case, if I didn't say it earlier, this is an admitted negligence case. Typically, oftentimes we don't get into the collisions and that; but here you haven't admitted causation entirely. You haven't admitted damages and causation. So obviously, there could be some relevance to a tape. But it also doesn't show the upper portions of the cage. It shows the plaintiff's—his lower legs, his feet.

And it appears that this collision was not perhaps as forceful as is being suggested to this jury by these presentations in court that aren't making the record, but they have been placed on the record now. So just don't go there anymore. I want to leave the ruling alone, is what I'm trying to say."

¶ 50    After both parties had rested, while outside the presence and hearing of the jury, defendant's attorneys renewed their request to admit the video into evidence but in light of the

trial judge's earlier ruling asked to make an offer of proof. The trial judge noted the admission

of the video was argued extensively before trial in a motion *in limine* and that there had been

subsequent requests for its admission which had been denied with the court standing on its

original ruling. Defendant's attorney recalled a witness (defendant's vice-president and in-house

counsel) who testified that she was familiar with the surveillance video and that the video fairly

and accurately depicts the conditions of the facility as they existed at the time of the accident.

The witness testified the video was at normal speed and that the video fairly and accurately

depicts the accident. The witness testified the video is not time-lapsed. On cross-examination

the witness testified that her sole basis for testifying that the video showed real time was a time

clock on the video that counts every second (without any jumps in time) during playback. The

witness also testified her testimony was based on what was visible on the video and that she does

not have any particular expertise in this area.

¶ 51    The trial judge ruled it would stand on its original ruling and made a record as to why,

stating in pertinent part as follows:

> "THE COURT: I was told, late in the game or so to speak or late towards
>
> the end of the case defense admitted negligence in this matter and was conceding
>
> that there were some injuries during the course of the incident, but they were
>
> contesting the nature and extent of injuries and the cause of those claimed injuries
>
> and damages.
>
> So it was in that context that this video eventually arises and defense
>
> wants to present it to the jury so they can understand the mechanism by which this
>
> occurred, in other words, how this crane hit this lift, because it lent itself to all
>
> sorts of speculation on the jury's part as to what action was involved in here.

What the Court said was that the defense ultimately can present still shots prior to the point of contact to the jury, so the jury knew exactly that this was a large I-beam crane that was striking the lift on its arm somewhere below the basket as plaintiff worked in that basket above the floor of the facility. And then thereafter, after the point of contact and whatever it did to the lift, because there was some jostling, if you will, that once things had quote unquote settled down, you could show the video thereafter, because that was germane and relevant to the issues in the case, him lowering himself down and what he did thereafter, both sides wanted at least that portion of the tape for various reasons perhaps shown to the jury that are relevant to the issues.

So I stand on the ruling. I would note that you have conceded negligence. Typically we don't get into the nature of the contact, but obviously in this case there's some relevance to it.

Likewise, I was concerned about the fact that only the bottom portion of the basket is visible, and you can see the plaintiff's feet in that basket at some portion of the video and just above his feet up to calf area, but you can't see torso or upper body during the point of impact and displacement it caused on this J-lift. And so that was the other reason the Court was concerned about admitting the tape and showing it to the jury.

The simple proposition is the defense just wanted the jury to understand the nature of the collision or impact, where it occurred with reference to these two vague notions of cranes and lifts. That was achieved by the Court's ruling that you can present still shots and then thereafter. I stand on that ruling at this point.

This is an admitted negligence case and if, you know, if you have some experts to talk about mechanism of injuries or biomechanics it might have been highly relevant, and certainly if there was some challenge as to the foundation for the video, which appears to be somewhat, you know, normal video, but perhaps there's some stiltedness to it, if you will, if that's the right word, because there was an objection and this wasn't going to come out anyhow and you wanted to offer it for limited reasons, I think that's the appropriate ruling."

¶ 52    Defendant's attorney informed the trial judge that it was offering the video "in response to the actions by the plaintiff's attorney and witnesses who described the accident and for the jury to see the video in response to that as well."  The trial judge responded that point was noted, but the court was not going to change its ruling.  In ruling on defendant's posttrial motion, the posttrial judge found: "It's within the discretion of the Court to allow it.  *** [I]f I was there, I might have done something differently, it was within the discretion of the Court.  And, you know, not playing that one portion of the video I don't think is an abuse of the Court's discretion."

¶ 53    On appeal, defendant argues that a refusal to grant its posttrial motion on the trial judge's ruling on the motion *in limine* and defendant's motion to reconsider the ruling on the motion *in limine* would be an abuse of discretion.  Defendant argues the video should have been admitted because the video fairly and accurately shows the circumstances of the accident.  Defendant also asserts the trial judge found that plaintiff's conduct during trial generated the relevancy of the video, and that conduct prejudiced the jury as demonstrated by the award of noneconomic damages.  Specifically, defendant argues:

> "The relevance and need for the video was generated by the prejudicial
>
> misconduct of plaintiff's counsel, in repeatedly referring to the impact as a
>
> 'collision' and pounding his fist when he called it a 'collision.'
>
> \*\*\*
>
> The video should have been admitted to address the issues raised by
>
> plaintiff's counsel in order to rebut his mischaracterizations."

Defendant argues "[t]he mischaracterization of the impact goes to the nature, extent and duration

of the injury." Defendant asserts it "sought to cure the prejudice created by [plaintiff's]

counsel's conduct by introducing the video into evidence." As to the trial judge's initial ruling

on the motion *in limine*, defendant argues the video is admissible under the "silent witness"

theory because plaintiff admitted a portion of the video and thus , and the accuracy of the

recording process that produced the video was uncontested. See *People v. Taylor*, 2011 IL

110067, ¶ 35 (discussing the foundational requirements for establishing the accuracy of a process

that produces surveillance camera recordings).

¶ 54    The trial judge granted the motion *in limine* in part because defendant could still achieve

its stated objective to show the jury what was meant when the jury would be informed that a

crane struck a lift. Defendant had informed the court "[t]he point is to let the jury see how the

accident happened \*\*\*. We're going to hear \*\*\* a crane hit a boom. I mean it's very possible

that a juror could think this thing almost like completely fell over." The trial judge expressed his

belief the defense could achieve their purpose with still frames from the video. The trial judge

reiterated that basis for his holding in response to defendant's motion at the close of all evidence

to reconsider the earlier ruling on the motion *in limine*. In response to the motion to reconsider

the trial judge stated: "The simple proposition is the defense just wanted the jury to understand

the nature of the collision or impact, where it occurred with reference to these two vague notions

of cranes and lifts. That was achieved by the Court's ruling that you can present still shots and then thereafter." On appeal, defendant does not argue the still images were inadequate for *that* purpose; defendant argues the still images "cannot cure the mischaracterizations by plaintiff's counsel that this incident involved a 'very forceful impact' or 'large impact.' "

¶ 55    "The admission of evidence is largely within the discretion of the trial court, and its rulings will not be disturbed absent an abuse of discretion. [Citation.]" *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007). "We will conclude that a trial court abused its discretion only where no reasonable person could have agreed with the trial court's decision. [Citation.]" *Id.* The trial judge concluded that the prejudicial effect of the video outweighed its probative value on the question of how the accident occurred, which was defendant's stated purpose for admitting the video. Defendant does not argue the still images did not permit defendant to convey to the jury how the accident happened and limit the jury's speculation about the nature of the crane and the boom. Given defendant's stated purpose to show the type of crane, where it struck the lift, and that the lift did not collapse, we cannot say that no reasonable person would agree with the trial court. Accordingly, we find no abuse of discretion in the trial judge's ruling on the motion *in limine*.

¶ 56    Turning to defendant's request to admit the video at the close of evidence, at which point plaintiff's conduct had allegedly "generated the relevancy of the video," we review the trial judge's decision for an abuse of discretion. *State Farm Mutual Automobile Insurance Co. v. Trujillo*, 2018 IL App (1st) 172927, ¶ 26. "Where the denial of a motion to reconsider 'is based on new matters, such as additional facts *** that were not previously presented during the course of proceedings leading to the order being challenged, we are to employ an abuse of discretion standard of review.' [Citations.]" *In re Estate of Agin*, 2016 IL App (1st) 152362, ¶ 18. Defendant argues the trial judge abused his discretion because the video should have been

admitted to rebut plaintiff's mischaracterizations of the force of the impact of the crane resulting from plaintiff's attorney's conduct of slamming his fist and referring to the impact as a smash or a collision. Defendant argues this mischaracterization "improperly implied to the jury that the impact was more forceful than it actually was." Defendant also argues that had the trial judge considered defendant's posttrial motion in the light of the "enormous award for non-economic damages," there is a good chance the trial judge would have granted the posttrial motion to admit the video.

¶ 57 Plaintiff argues that because the video only shows his feet and inaccurately portrays the speed of the collision the video is prejudicial with no probative value. Plaintiff also argues the video would lead to speculation by the jury as to what happened to plaintiff's body, and defendant's medical witnesses "did not offer any opinions connecting the accident video and the injury or lack thereof." As for plaintiff's attorney allegedly "generating the relevance" of the video, plaintiff argues the trial judge was present during trial, witnessed plaintiff's counsel's conduct, and "was well within its discretion to make the determination that Plaintiff's counsel's punching his fists a few times and using the word collision did not warrant showing the video." Alternatively, plaintiff argues defendant failed to lay a proper foundation for the video and failed to demonstrate how excluding the video changed the outcome of the trial.

¶ 58 The effect of plaintiff's counsel's conduct on the jury is merely speculative. See *Larkin v. George*, 2016 IL App (1st) 152209, ¶ 14 ("plaintiff failed to present any evidence that the jury's awareness of the existence of the photographs prejudiced him. Bare speculation and unsupported presumptions are insufficient to establish that plaintiff was prejudiced."). The trial judge admonished plaintiff's counsel not to repeat its conduct and defendant has pointed to no further instances of the acts or words at issue. Moreover, plaintiff's counsel's words and actions were not evidence. Under the circumstances, and in light of evidence of plaintiff's injuries,

which we discuss below, we cannot say counsel's acts contributed to the jury's noneconomic damages award such that the trial judge abused his discretion in not admitting the video to cure any prejudice. Additionally, the trial judge was aware of plaintiff's counsel's conduct but adhered to its finding that the potential prejudice to the plaintiff from showing the video outweighed its probative value.

> "Even relevant evidence may contain drawbacks of sufficient importance to call for its exclusion, including unfair prejudice, confusion of the issues, and misleading the jury. [Citations.] *** [I]f the evidence is merely confusing and creates uncertainty, that alone may suffice to tip the balance in favor of exclusion when the information sought to be presented contains negligible probative value. [Citations.]" *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574 (2002).

The trial court was concerned not only with the prejudice that might result from the video misleading the jury as to the force of the impact but also the potential for speculation as to the effect of the impact on plaintiff's "torso or upper body during the point of impact and [the] displacement it caused." See *id.* at 575 (finding evidence "was likely to confuse and mislead the jury or result in speculation on the jury's part"). That determination by the trial judge was not arbitrary, fanciful, or unreasonable, and we cannot say that no reasonable person would take the same view. *Check*, 342 Ill. App. 3d at 157. Accordingly, we find he trial judge did not abuse his discretion is refusing to admit the surveillance video of the incident.

¶ 59                    B. Remittitur—Future Medical Expenses

¶ 60    Next, defendant argues it is entitled to a remittitur of the award for future medical expenses because there is nothing in the record from which the jury could reasonably estimate the cost of future surgeries testified to by Dr. Coe and another of plaintiff's doctors. (A second doctor recommended spinal fusion surgery.) In this case the parties stipulated that plaintiff's

past medical expenses was approximately $157,000. The jury awarded damages for future medical expenses of $150,000. For the reasons that follow, we do not find that the award for future medical expenses falls outside the range of fair and reasonable compensation, or results from passion or prejudice, or is so large that is shocks the judicial conscience.

> "The determination of damages is a question reserved for the trier of fact, and, as a reviewing court, we give great deference to a jury's damage award. [Citations.] An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that is shocks the judicial conscience. [Citation.] Where the jury's award falls within the flexible range of conclusions reasonably supported by the evidence, a remittitur should not be granted. [Citations.] We review a trial court's ruling on a motion for remittitur for an abuse of discretion. [Citations.]" *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 80.

¶ 61    Defendant argues plaintiff cannot rely on cases allowing juries to consider the cost of future medical treatment based on the cost of past medical treatment because in each of those cases "the future medical treatment *** actually related to the past medical treatment." In this case, defendant argues, "future hip replacement surgery and spinal fusion surgery are entirely distinct from Plaintiff's past medical treatment." In other words, the cost of the future surgeries cannot be determined from plaintiff's past medical treatment because plaintiff never underwent those surgeries, and there is no other evidence to support the jury's award. Plaintiff, in support of his argument that future medical expenses should not be remitted, argues "it [is] within the province of the jury to determine future medical bills even though there is no testimony as [to] what the amount of those bills would be[,] because the jury knew what the prior medical bills were," citing *Price v. Victory Baptist Church of Sunnyland*, 205 Ill. App. 3d 604 (1990), *Lewis*

*v. Cotton Belt Route-St. Louis Southwestern Railway Co.*, 217 Ill. App. 3d 94 (1991), *Blackburn v. Illinois Central Railroad*, 379 Ill. App. 3d 426 (2008), and *Aguilar-Santos v. Briner*, 2017 IL App (1st) 153593.

¶ 62     In *Victory Baptist Church of Sunnyland*, 205 Ill. App. 3d at 610, the defendant argued the jury had no basis on which to award future medical expenses.  The plaintiff, who fell twelve feet from a ladder to a concrete floor, "had already undergone two knee operations and had shown little sign of improvement.  [A]n orthopedic surgeon testified more operations would probably be done in the future."  *Id.*  The past expenses were known to the jury.  *Id.*  The jury awarded future damages that were "nearly two and one-half times the amount of medical expenses that had already accrued."  *Id.*  The court noted that the plaintiff's future medical expenses "will range from operations to therapy to regular maintenance and replacement of knee braces; he may need crutches or a wheel chair to get around."  *Id.*  The court did not note any testimony or evidence that the plaintiff's past medical expenses included any of those items. See *id.*  The plaintiff argued that the orthopedic surgeon "gave no specific estimate of the future costs of the plaintiff's medical care."  *Id.*  The court held that "[f]uture medical expenses may be determined without a precise estimate in the circumstances that exist here."  *Id.*  The court found no basis for granting a new trial on the issue of future medical expenses.  *Id.*

¶ 63     In *Cotton Belt Route-St. Louis Southwestern Railway Co.*, 217 Ill. App. 3d at 118, the defendant argued that the plaintiff's attorney made improper prejudicial remarks during closing argument that resulted in the jury awarding damages for future medical care and expenses based on passion and prejudice.  The defendant argued "there was no evidence as to the type, frequency, or amount of medical treatment [the] plaintiff would require and that the only evidence on the question of future medical expenses was the testimony of [the plaintiff's doctor] that [the] plaintiff has needed treatment for almost four years and, in [the doctor's] opinion, [the]

plaintiff would need treatment in the future." *Id.* The defendant sought a new trial or a remittitur of the jury's award for future medical expenses "because any award for future medical expenses was against the manifest weight of the evidence." *Id.* The court rejected the defendant's argument that the fact the damages award for future medical expenses "was approximately 10 times the amount of [the] plaintiff's proven special damages" proved the verdict was a result of passion and prejudice. *Id.* at 123. The court reasoned that because the plaintiff had testified that he stopped seeking medical treatment because he could not afford the bills "the jury could reasonably have assumed that [the] plaintiff's past medical expenses could have been much higher and accordingly projected future medical expenses in an amount 10 times higher than the special damages." *Id.* The court also found that "the jury could reasonably have found that for the rest of [the] plaintiff's life he would quite assuredly need access to some continuing medical care for his injury and that nearly $105,000 approximated the cost of that care over the next 34 years [(the plaintiff's life expectancy)]." *Id.* at 124. The court did not state that the jury could have reasonably found that the plaintiff's "continuing medical care *** over the next 34 years" would resemble the plaintiff's past medical care. See *id.* The court concluded "that the verdict does not fall outside the limits of fair and reasonable compensation, that there is no indication that it resulted from passion or prejudice, and that it is not so large as to shock the judicial conscience under the facts of this case." *Id.*

¶ 64    In *Blackburn*, 379 Ill. App. 3d at 432, the defendant argued an award for future medical expenses "should be reversed because the plaintiffs did not produce evidence of any specific medical expenses that they would incur in the future other than 'generic references' to periodic visits to a physician for a chest X-ray." The court held that "the trier of fact enjoys a certain degree of leeway in awarding compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the testimony. [Citation.]"

(Internal quotation marks omitted.) *Id.* In *Blackburn*, medical experts testified that "because the plaintiffs were diagnosed with asbestosis, they would need periodic X-rays, medical exams, and colonoscopies." *Id.* Another doctor "testified that an asbestosis patient must have routine pulmonary testing throughout his life." *Id.* One of the plaintiffs "testified that he plans to monitor his condition with his family doctor." *Id.* Another plaintiff "testified that he also plans to monitor his health," and a third "testified, without objection, that his doctor told him he would need a chest X-ray every year." *Id.* The court found "that the amounts awarded fall within a range of fair and reasonable compensation for periodic X-rays, exams, and other diagnostic testing that the evidence shows the plaintiffs will face due to the asbestosis diagnosis." *Id.* at 433. Additionally, without discussing the plaintiffs' prior medical expenses, the court found that "these amounts are not so large that we can say that they are based on juror passion or prejudice or that they shock the judicial conscience." *Id.* The court stated it would "not substitute our judgment for that of the jury." *Id.* The court held the "circuit court did not err in allowing the jury's verdict with regard to future medical expenses to stand." *Id.*

¶ 65    In *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 11, the defendant filed a motion *in limine* to bar any claim for medical expenses because neither of the plaintiff's doctors testified in their evidence depositions as to the cost of any future medical treatment and the plaintiff "identified no other witness who could testify as to the cost of treatment that [the plaintiff] may incur in the future." The trial court revisited its order denying the motion *in limine* after all of the evidence had been presented. *Id.* ¶ 38. The defendant argued "there was insufficient testimony to support the future cost of [the plaintiff's] prescription medication because no physicians testified regarding the amount of any future costs and there was no testimony regarding how long [the] plaintiff would need to take any prescription medication and in what amounts." *Id.* The trial court denied the motion *in limine*. *Id.* On appeal, the court held the jury's award for future

medical expenses was supported by the evidence. *Id.* ¶ 72. The court noted that the plaintiff had testified to the cost of her existing prescription medications and that her doctor testified that the plaintiff's condition was unlikely to change. *Id.* ¶ 71. The court held that "[b]ased on this evidence, a reasonable person could conclude that plaintiff would continue to incur the costs associated with her prescription medication. [Citation.]" *Id.* The court rejected the defendant's contention the jury had to speculate as to the amount of damages to award and held the award for future medical expenses was supported by the evidence because the plaintiff testified regarding the cost of her medication for the seven years between the accident and the trial, and a table showing the plaintiff's life expectancy was admitted into evidence. *Id.* ¶ 72.

¶ 66    The *Aguilar-Santos* court focused on one category of medical expense (medication) and the plaintiff's testimony as to the cost of that expense in the past, and it found that the jury's award of damages for that expense in the future was not based on speculation because there was an evidentiary basis for the award. *Id.* ¶ 72. The *Aguilar-Santos* court did not hold that the jury was limited to that category of prior medical expenses in its award for future medical expenses, and there would have been no need to in that case. The plaintiff's doctor testified the plaintiff only had two options with regard to her injury: have surgery that was not guaranteed to be successful or live with the pain. *Id.* ¶ 27. The plaintiff testified she would not have surgery because of the risks involved. *Id.* ¶ 28. Therefore, there was only one possible category of medical expenses the jury could have awarded based on the evidence. The fact that the only category of future medical expenses that was available to the jury in *Aguilar-Santos* was the same category of medical expenses the plaintiff incurred in the past does not mean that when the jury must rely on past medical expenses to determine future medical expenses, the jury can only award future medical expenses for the same type of expenses the plaintiff incurred in the past. The authorities are to the contrary.

¶ 67 In *Victory Baptist Church of Sunnyland*, there was nothing to suggest that the future medical expenses the court held the jury could award had been incurred in the past. *Victory Baptist Church of Sunnyland*, 205 Ill. App. 3d at 610. In *Cotton Belt Route-St. Louis Southwestern Railway Co.*, the court found that "the jury could reasonably have found that for the rest of [the] plaintiff's life he would quite assuredly need access to *some* continuing medical care for his injury." (Emphasis added.) *Cotton Belt Route-St. Louis Southwestern Railway Co.*, 217 Ill. App. 3d at 124. This statement by the court was not categorical and did not limit the award of future medical expenses to those that mirrored the plaintiff's past medical care. See *id.* And in *Blackburn*, the court did not discuss the plaintiff's prior medical expenses at all. *Blackburn*, 379 Ill. App. 3d at 432.

¶ 68 Defendant cites *Richardson v. Chapman*, 175 Ill. 2d 987 (1997) as instructive, but that decision does not aid defendant's position that the jury could not award future medical expenses for procedures plaintiff has not had in the past because no one testified to their cost. In *Richardson*, the plaintiff's economist "testified that the present cash value of [the plaintiff's] future medical expenses had a lower bound of $7,371,914 and an upper bound of $9,570,034." *Richardson*, 175 Ill. 2d at 106. The jury awarded damages for future medical expenses that were "nearly $1.5 million more than the higher of the two figures claimed at trial." *Id.* at 112-113. The plaintiff pointed out that the list of likely future medical costs the economist used to determine their present cash value "did not assign specific values to certain items, such as the expenses of future hospitalizations and the costs of wheelchairs and a specially equipped van." *Id.* at 112. The plaintiff argued that "the jury's decision to award an amount for future medical costs greater than [the] higher estimate might simply reflect the jury's desire to compensate [the plaintiff] for those unspecified but likely expenses." *Id.* Our supreme court agreed with the plaintiff "that the trier of fact enjoys a certain degree of leeway in awarding compensation for

medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the testimony." *Id.* But the court found that "[g]iven the disparity between the trial testimony and the jury's eventual award," it could "not attribute the *entire* difference *** to miscellaneous costs." (Emphasis added.) *Id.* at 113. The court made an adjustment that did not erase the entire differential, but which allowed the plaintiff "recovery for expected future medical costs for which no specific estimates were introduced, yet is not so large that it represents a departure from the trial testimony." *Id.*

¶ 69 Thus, *Richardson* does not support the proposition that only those future medical expenses specifically testified to or which have occurred in the past can be awarded. The jury may award "compensation for medical costs that, as shown by the evidence, are likely to arise in the future but are not specifically itemized in the testimony." *Richardson*, 175 Ill. 2d at 112. Here, plaintiff's stipulated past medical expenses were $157,000. The jury awarded damages for future medical expenses of $150,000. We do not find that the award for future medical expenses falls outside the range of fair and reasonable compensation, or results from passion or prejudice, or is so large that is shocks the judicial conscience. Defendant's argument, therefore, fails.

¶ 70                                 C. Remittitur—Noneconomic Damages

¶ 71 The jury awarded plaintiff $8.3 million in damages for the loss of normal life and pain and suffering plaintiff had already experienced and that he would experience in the future. Defendant argues these damages fall outside the range of fair and reasonable compensation, result from passion or prejudice, and shock the conscience. Defendant argues that plaintiff's testimony that he can no longer enjoy swimming, gardening, kayaking, fishing, boating, or hunting is rebutted by evidence that he can shovel snow and cut grass. Defendant notes that plaintiff's injuries are not life threatening, "[he] is not crippled," and "[h]e is able to work light duty." In sum, defendant argues "[p]laintiff's case does not present the kind of catastrophic

injuries which could rationally support an award of $8,300,000 for non-economic damages." Defendant also argues the award resulted from prejudice caused when plaintiff's attorney suggested the impact was a severe "collision," when plaintiff's attorney elicited testimony suggesting defendant withheld medical care from plaintiff, and when plaintiff's attorney informed the jury that defendant had not admitted liability until late in the proceedings. Defendant asserts that "it is plain that this misconduct is directly related to the excessive award for non-economic damages."

¶ 72    Plaintiff provided the testimony allegedly suggesting defendant withheld medical care. During his direct examination, during questioning about the accident itself, plaintiff's attorney asked plaintiff the following questions, and plaintiff gave the following answers:

> "Q. All right.  So what happened next?
>
> A. The gentlemen that I was speaking to in the last video was, I think, the plant manager; and I asked him to call me an ambulance.
>
> Q. Do you remember what happened?
>
> A. He wasn't too concerned about calling me an ambulance.  He wanted to bring me into the plant and take an incident report from me.
>
> Q. And then what happened?
>
> A. So he called out the foreman, the safety director, the VP, and myself, and just start drilling me with a whole bunch of questions about how I got hit by the crane.
>
> Q. And what happened next?
>
> A. So I sat with them for about 15 or 20 minutes.  And I said, 'You know, I really want to go get myself checked out.  I'm in a lot of pain.  I said, you know,

'I need you to call me an ambulance or have somebody drive me to the hospital.'
And they weren't too concerned about it, again.

[Objection sustained.]

Q. What happened next?

A. So they asked me to come back in to ask me more questions, and I refused. And I said, 'I'm going to call myself an ambulance.' And they got very irate with me, and they told me to call my company. So I called the guy that I was working with—I guess you could call him my foreman, at the time. He had went to a different job that day. And he freaked out, and within about 30 minutes he was there. And I'm still asking them to call me the ambulance, and they're not---"

Defendant objected again, and the trial judge called the attorneys to a sidebar. The trial judge told plaintiff's attorney the testimony he was eliciting from plaintiff was irrelevant, prejudicial, and designed to inflame the jury, and that plaintiff's attorney was doing it intentionally. Defendant's attorney asked the court to strike the testimony at issue and the court initially refused, stating the objection and request to strike were untimely. After further discussion, defendant's attorney asked that plaintiff's testimony about his conversations after the accident be stricken. The court asked defendant's attorney if he was "going to try to cure it in some way with any testimony" and defendant's attorney responded he was not. When proceedings resumed in front of the jury, the court informed the jury it was to strike those questions and answers "posed to the witness about what happened next and conversations [that] occurred."

¶ 73    After plaintiff rested his case, and before defendant began to present its case, defendant's attorney informed the trial judge: "Your Honor, we are, in rebuttal in terms of what came up with the plaintiff we intend to call Ms. Sullivan [(defendant's vice-president and in-house counsel)] to

testify and dispute what plaintiff claims occurred after the accident with her and others."

Plaintiff's attorney objected on the ground defendant's objection to the testimony had been

sustained and the jury instructed to disregard the testimony. The trial judge asked defendant's

attorney for an offer of proof. Defendant's attorney informed the trial court that defendant's in-

house counsel would testify that she met with plaintiff and "that none of that occurred in terms of

his asking for [an] ambulance or being denied an ambulance or medical care at his request."

After lengthy discussions of the issue, the trial judge ruled the defense would be allowed to call

its witness and that it would admonish the jury that it now could consider the answers that had

been given by plaintiff. Plaintiff called the witness to testify. She stated that at the time of the

accident she was defendant's vice-president of administration, secretary, and counsel. She

testified no one from defendant prevented or prohibited plaintiff from seeking medical treatment

and had plaintiff requested an ambulance that request would have been complied with. On cross-

examination the witness testified defendant did not call an ambulance or have someone take

plaintiff to the hospital. After the witness testified, the trial judge instructed the jury as follows:

> "THE COURT: Ladies and Gentlemen, yesterday there was some
>
> questions on the topic that were posed to the plaintiff and at that time I made a
>
> general admonition for you to disregard it and strike it. Whatever answers that
>
> were given at that time by the plaintiff you can consider in the context now, fuller
>
> context of the case based on the testimony you just heard."

¶ 74 On appeal, plaintiff argues that defendant invited or acquiesced to any error in admitting

plaintiff's testimony regarding his alleged request for an ambulance. In response to this

argument by plaintiff, defendant claims that plaintiff "argues that the prejudicial misconduct was

waived because defense failed to timely object" but "the objection appears on the same page of

the record in which plaintiff testified" about the ambulance.

¶ 75    Defendant did object, initially, then changed course when it learned defendant's in house counsel could testify no one prevented plaintiff from seeking medical treatment. "[T]he jury is presumed to follow the instructions given to it by the court. [Citation.] A circuit court's instruction to disregard certain evidence can cure prejudice resulting from the jury's exposure to that evidence. [Citation.]" (Internal quotation marks omitted.) *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 47. Rather than relying on the trial judge's striking of the evidence and instruction to the jury, defendant solicited testimony on the subject from its in house counsel knowing that soliciting that evidence would result in the trial court admonishing the jury it could consider plaintiff's testimony on the same subject, which the court did without objection from defendant. "A party who 'procures, invites or acquiesces' in the admission of improper evidence cannot complain that such evidence was prejudicial to his case. [Citations.]" *Smith by Smith v. Victory Memorial Hospital*, 167 Ill. App. 3d 618, 623 (1988). We will not consider any allegedly unduly prejudicial effect from plaintiff's testimony concerning plaintiff's alleged request for an ambulance.

¶ 76    Similarly, defendant objected to plaintiff's counsel's comment during opening statements suggesting defendant had only recently admitted liability. During opening statements, plaintiff's attorney stated as follows: "So this is what the case is about. If I admit something, I acknowledge it's true. If I accept something, I actually do something to make it right. They have admitted and there's no doubt about that for the last week or so we've appreciated the admission. But the acceptance is not worth money." Defendant's attorney objected and the trial judge sustained the objection. The trial judge further admonished the jury as follows:

> "THE COURT: You're to strike that from your mind. You didn't hear it.
>
> Don't consider a comment like that from an attorney. Strike it from your mind.
>
> Is there anyone who doesn't understand that order? Attorneys shouldn't make an

argument like that. Anyone who doesn't understand, raise your arm. No one's raised their hand."

¶ 77 "Improper comments generally do not constitute reversible error unless the party has been substantially prejudiced. [Citation.] Where the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice. [Citation.]" (Internal quotation marks omitted.) *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 862 (2008). In this instance the trial judge immediately sustained defendant's objection and thoroughly admonished the jury. Moreover, defendant does not explain how the jury's knowledge of when it admitted liability, if the jury understood plaintiff's attorney's comment, prejudiced defendant. In light of all of the foregoing (see also *supra* ¶ 58) we cannot say the jury's noneconomic damages awarded resulted from passion or prejudice.

¶ 78 We next turn to the question of whether the damages fall outside the range of fair and reasonable compensation, result from passion or prejudice, or shock the conscience because plaintiff's damages are not "catastrophic."

> "It is well settled that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine and that great weight must be given to the jury's decision. [Citation.] The very nature of personal injury cases makes it impossible to establish a precise formula to determine whether a particular award is excessive or not. [Citation.] [A] court reviewing a jury's assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered. [Citation.]" (Internal quotation marks omitted.) *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 169.

"Furthermore, whether an award is excessive must be decided from consideration of permanency and extent of the injury, possible future deterioration, medical expenses, and restrictions on daily activity due to the injury. [Citation.]" *Marchese v. Vincelette*, 261 Ill. App. 3d 520, 530 (1994).

¶ 79    The evidence at trial was that since the accident plaintiff has back and hip pain when he walks. He also walks with a limp that can be controlled with medication. He can no longer do "the aggressive-type work that's required" of his former gardening activities so he asks his son to do it. He no longer goes boating and now fishes only rarely. Plaintiff testified he can no longer wade in the water to fish because it hurts his back and hip, so he "lost interest in it" which he found "disheartening." He also no longer lifts weights like he used to. Plaintiff can perform normal daily activities but they cause him pain. He always has pain in his shoulder and hip, it is just sometimes less severe than other times. Plaintiff also testified he has pain in his back that is worsened when walking down stairs, walking short distances for short periods of time, climbing stairs, or walking around the yard. Plaintiff testified that if he bends the wrong way, or squats to pick something up, or anything else, it will sometimes, but not every time, cause "immediate and instant pain" in his back. Plaintiff testified he does not go on vacations anymore, cannot stand for long periods of time, does not swim anymore, and does not raft anymore. Plaintiff testified he loved playing the drums but he can no longer do it pain-free. Plaintiff also testified he loved doing his job as an electrician but he can no longer do electrician work, which he misses. Plaintiff also testified his relationship with his wife has deteriorated as a result of the accident. Plaintiff's wife testified that prior to the accident they had a satisfying sex life but now due to plaintiff's complaints of pain, they no longer sleep in the same room.

¶ 80    The evidence established that defendant was physically active and enjoyed his career as an electrician and now cannot engage in the employment or activities he once enjoyed, and he is in some level of pain constantly which escalates with ordinary daily activities. We cannot say

that the jury's assessment of damages resulted from passion or prejudice, bears no reasonable relationship to the loss suffered by plaintiff, or is so large as to shock the judicial conscience. See *Neuhengen*, 2018 IL App (1st) 160322, ¶ 169. Defendant's request to this court for a remittitur is denied.

¶ 81 CONCLUSION

¶ 82 For the foregoing reasons, the circuit court of Cook County is reversed.

¶ 83 Reversed.